UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                  :

UNITED STATES OF AMERICA      :        S1 23 Cr. 504 (JSR)
                                  :

          -v.-                  :
                                  :

FELIX HERRERA GARCIA,      :
                                  :

                 Defendant.     :
                                  :
-------------------------------------------------------------x

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Brandon Thompson
Maggie Lynaugh
Justin Rodriguez
Assistant United States Attorneys

Karl Miller
Special Assistant United States Attorney
    *Of Counsel*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ...................................................................................................................... 10

   I. Surveillance Footage Depicting the Minor Victims on September 15, 2023 Should be Admitted to Establish a Timeline of Events and Prove Minor Victim-2 Suffered Serious Bodily Injury. ......................................................................................................................... 10

   II. Testimony and Photographs from the Parents of the Minor Victims Demonstrating that the Children Had Previously Behaved Strangely After Returning Home from the Daycare Should Be Admitted To Establish the Defendant's Continual Use of the Daycare as a Drug Distribution Facility and the Existence and Conduct of the Conspiracy. ....................... 14

   III. Statements Made by Mendez on Body Camera Footage when Emergency Personnel Arrived at the Daycare Should Be Admitted To Establish a Timeline of Events Relevant to How the Minor Victims Were Poisoned by Narcotics. ........................................................ 16

   IV. Certain Text and Voice Messages Furthering the Goals of the Narcotics Conspiracy Exchanged Among Co-Conspirators Approximately Four Months Prior to the Date of the Charged Conspiracy Should Be Admitted to Prove the Existence and Conduct of the Conspiracy. ........................................................................................................................ 17

   V. Limited Evidence Concerning the October 20, 2022 Death of the Defendant's Brother, CC-1, Should Be Admitted to Prove the Extended Duration of the Conspiracy and the Defendant's Involvement in that Entire Duration. .................................................................. 21

   VI. Testimony from CW-1 and Voice Message Evidence Concerning the Potential Exposure of the Defendant's Minor Child to Controlled Substances in the Daycare Space Should be Admitted to Prove the Existence and Conduct of the Conspiracy ............... 22

   VII. Evidence Concerning the Defendant's Flight Prior to Arrest Should Be Admitted To Provide Evidence of the Contents of the Bags the Defendant Removed from the Daycare and Demonstrate the Defendant's Consciousness of Guilt and Involvement in the Conspiracy. ................................................................................................................... 25

CONCLUSION .................................................................................................................... 29

## **TABLE OF AUTHORITIES**

**Cases**

*Bourjaily v. United States*, 483 U.S. 171 (1987)...............................................................................23

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ....................................................................11

*Davis v. Washington*, 547 U.S. 813 (2006)...............................................................................17

*United States v. Al-Sadawi*, 432 F.3d 419 (2d Cir. 2005)...........................................................27

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ..............................................................27

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001) .........................................................24, 25

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)....................................................................24

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ...........................................................12

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) .............................................................23

*United States v. Gonzalez*, 110 F.3d 941 (2d Cir. 1997) ...........................................................11

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) ...............................................................24

*United States v. Hatfield*, 685 F. Supp. 2d 320 (E.D.N.Y. 2010)................................................27

*United States v. Kuo Chen*, 2011 WL 197585 (E.D.N.Y. 2011)..................................................14

*United States v. Jimenez*, 789 F.2d 167 (2d Cir. 1986) .............................................................12

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)..............................................24

*United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977) .............................................................27

*United States v. Perez*, 387 F.3d 201 (2d Cir. 2004) ................................................................27

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) ................................................................24

*United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989) .............................................................24

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) .......................................12, 14, 15

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ..................................................................20

*United States v. Steele*, 390 F. App'x 6  (2d Cir. 2010)............................................................27

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) ........................................ 24

*United States v. Teague*, 93 F.3d 81 (2d Cir. 1996) ..................................................... 21

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ....................................................... 24

*United States v. Ulbricht*, 79 F. Supp. 3d 466 (S.D.N.Y. 2015) ................................. 27

*United Stats v. Salameh*, 152 F.3d 88 (2d Cir. 1998) .................................................. 13

## **Rules**

Fed. R. Evid. 401 ........................................................................................................... 11

Fed. R. Evid. 402 ........................................................................................................... 11

Fed. R. Evid. 403 ..................................................................................................... 11, 15

Fed. R. Evid. 801(d)(2)(A) ............................................................................................ 17

Fed. R. Evid. 803(2) ...................................................................................................... 17

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in support of its motions *in limine* seeking rulings on the following requests with respect to the defendant's upcoming trial, which is set to begin on June 10, 2024:

1. To admit surveillance footage showing the child-victims on September 15, 2023 to: (1) establish a timeline of events relevant to how the children were poisoned, and (2) prove the serious bodily injury suffered by Minor Victim-2.[1]

2. To admit testimony and photographs from the parents of the Minor Victims demonstrating that prior to September 15, 2023, their children had behaved strangely after returning home from Divino Niño Daycare in the Bronx (the "Daycare"), in order to establish the defendant's continual use of the Daycare as a drug distribution facility, proving the existence and conduct of the conspiracy.

3. To admit statements made by Grei Mendez captured on police-worn body camera footage upon the arrival of emergency personnel at the Daycare on September 15, 2023 in order to establish a timeline of events relevant to how the children were poisoned.

4. To admit certain text and voice messages exchanged among co-conspirators that occurred within approximately four months prior to the dates of the conspiracy charged in the S1 Indictment in order to prove the existence and conduct of the conspiracy.

5. To admit limited evidence concerning the October 20, 2022 death of the defendant's brother in an apartment filled with narcotics and narcotics-packaging equipment, in order to provide background to the conspiracy, and prove the extended duration of the conspiracy and the defendant's involvement for the entirety of that duration.

6. To admit testimony and voice message evidence concerning the potential exposure of the defendant's minor child to controlled substances at the Daycare in order to prove the existence and conduct of the conspiracy.

---

[1] The terms Minor Victim-1 and Minor Victim-2 are used as they are defined in the S1 Indictment. That is, Minor Victim-1 is the child whose death is charged in Counts One and Two of the S1 Indictment; Minor Victim-2 is the child whose serious bodily injury is charged in Counts One and Three. Minor Victim-3 and Minor Victim-4 are used in this motion, but are not terms defined in the S1 Indictment. Minor Victim-3 and Minor Victim-4 were also present at the Daycare on September 15, 2023. As is further described below, Minor Victim-3 is the sibling of Minor Victim-2 and the youngest of the children injured at the Daycare; Minor Victim-4 is the child who was picked-up by his parents at approximately 12:50 p.m. on September 15, 2023.

7. To admit evidence concerning the defendant's flight following the poisonings at the Daycare on September 15, 2023, in order to provide evidence of the contents of certain bags the defendants removed from the Daycare and demonstrate the defendant's consciousness of guilt and involvement in the conspiracy.

## BACKGROUND

On September 15, 2023, at approximately 2:40 p.m., emergency personnel were called to the Daycare.  When they arrived, they found three children: Minor Victims-1 and -2, both boys approximately two years old, and Minor Victim-3, a girl approximately eight months old.  Minor Victims-1 and -2 were unresponsive.  All three children were rushed to the hospital.  Despite intensive medical intervention, Minor Victim-1 was declared dead shortly after arrival.  The medical examiner has determined his cause of death to be acute fentanyl intoxication.  The other two children—one of whom was in respiratory arrest—were hospitalized, treated, and ultimately survived.  All were found to have fentanyl in their systems.  Minor Victim-4, a boy approximately two years old, who had been picked up by a parent from the Daycare a short time before emergency services were called, was also rushed to the hospital after Minor Victim-4's parents realized that he was gravely ill.  Like the others, Minor Victim-4 had opioids in his system.  He was treated and survived. The children were poisoned by fentanyl because, as investigators subsequently learned, the defendant and his co-conspirators chose to operate a large-scale fentanyl packaging and distribution facility inside the Daycare.

### 1.  The Timeline of Events at the Daycare on September 15, 2024

All four children who attended the Daycare on September 15, 2023, were dropped-off by their parents between approximately 8:25 and 8:45 a.m.  All were healthy at the time of their arrival.  After engaging in morning activities, the children were fed a lunch prepared by Grei Mendez ("Mendez"), who was the owner and operator of the Daycare and the defendant's wife, and three of them were put down for a nap.  Minor Victim-4 was picked-up early by his mother at

approximately 12:50 p.m.  When Mendez went to wake the children from their nap several hours later, she found Minor Victim-1 and Minor Victim-2 unresponsive.  Minor Victim-3, the younger sibling of Minor Victim-2 and the youngest child at the Daycare, was responsive.  Mendez then placed a series of phone calls: first, a call to an employee of the Kingsbridge Heights Community Center, which oversaw the Daycare; then an approximately 11 second call to the defendant; and then a call to 911.

Moments after Mendez's call to 911,  but before emergency personnel arrived at the scene, the defendant rushed through the front door of the Daycare.  Approximately two minutes later, he exited the Daycare and rushed out the rear of the building in which it was housed, carrying two weighted bags.  The defendant then climbed through the bushes behind the Daycare, carrying those bags, and fled the scene.  All of this happened while Minor Victim-1 and Minor Victim-2 were lying unconscious in the Daycare.  In particular, Minor Victim-1 was located in a narrow hallway through which the defendant almost certainly passed upon his entry into the Daycare.

Only a few minutes after the defendant fled the Daycare, the mother of Minor Victim-2 ("Mother-2") arrived on the scene.  After peering through the windows of the Daycare, Mother-2 rushed inside to find that Mendez was holding Minor Victim-3, while Minor Victim-2 was unconscious on the floor.  Mother-2 then cleared a path for emergency personnel and attempted to seek help from others outside the Daycare.  Not finding any, she went back inside the Daycare, picked-up her seemingly lifeless son, and brought him outside where she attempted to revive him. Emergency medical personnel soon arrived at the scene.  One EMT ("EMT-2") assisted Mother-2, while a second EMT ("EMT-1") went inside the Daycare and found Minor Victim-1 lifeless with blue lips and no pulse or respiration.  After briefly attempting CPR, EMT-1 carried Minor Victim-1 out of the Daycare and into a waiting ambulance.

At the hospital, following approximately 30 minutes of efforts to provide emergency medical treatment after his arrival, Minor Victim-1 was pronounced dead. Minor Victim-2 presented in acute respiratory failure, but through emergency medical treatment, he was revived. Minor Victim-3, who was also brought to the hospital, was generally responsive, but displayed signs of opioid intoxication when failing to react properly to pain stimuli. During the course of their treatment, all three children (Minor Victims -1, -2, and -3) tested positive for fentanyl and were administered naloxone. Minor Victim-4, who was picked-up from the Daycare around 12:50 p.m., was taken separately to the hospital by his parents when he appeared to be gravely ill shortly after pick-up. Minor Victim-4 also tested positive for opioids.

The medical examiner has determined the cause of death for Minor Victim-1 to be acute fentanyl intoxication.

### 2. The Children Ingested the Fentanyl

Following the autopsy of Minor Victim-1, the Office of the Chief Medical Examiner of New York City ("OCME") sent the child's gastric (stomach) contents to a laboratory for testing. That testing revealed exceptionally high levels of fentanyl. By contrast, a significantly lower concentration of fentanyl was found in his blood. Toxicologists note that a comparison between the very high concentration of fentanyl in the child's gastric contents against the much-lower concentration in his blood reveals an imbalance that provides clear evidence that the child ingested—that is, ate—the fentanyl that killed him, and that the fentanyl in the blood resulted from that ingestion. In other words, the fentanyl was first eaten, gradually entering the blood from the gastrointestinal system, versus injection, inhalation, or other vectors of administration. Additionally, the sequence of events on the day of the poisoning incident confirms that ingestion is the most obvious source of the poisoning: all the children were poisoned simultaneously, just after being fed lunch. Moreover, toxicologists and other emergency doctors note absorption of

fentanyl through the skin or air is exceedingly improbable; while fentanyl is easily absorbed through the oral mucosa and digestive tract, it is only very slowly absorbed through the skin, and it is unlikely to be found floating in air.[2]

### 3. The Searches of the Daycare

Following the deadly poisoning of the four children, law enforcement personnel searched the Daycare, which was operated out of a one-bedroom basement apartment consisting of a playroom, a bathroom, a kitchen, and a bedroom, on two occasions. The first search, pursuant to a warrant, occurred the same night the children were taken to the hospital and uncovered both narcotics and tools used to package narcotics for distribution, including a one-kilogram brick of fentanyl in a closet near the bathroom and at least two "kilo press" machines.[3] The defendant's fingerprints were found on the plastic bags and wrap around the kilogram of fentanyl, and his DNA was found on the hydraulic bottle jack used to operate the kilo press. Law enforcement officers returned with another warrant on or about September 21, 2023. During the second search, law enforcement officers found two large traps—or concealed compartments—beneath the floorboards of the playroom. The traps contained stamps, glassines (many of which were stamped with the logo "Red Dawn"),[4] and other tools and instruments used to brand, package, distribute, and traffic narcotics. In addition, more than ten kilograms of narcotics, including fentanyl, para-

---

[2] As the Court is aware, additional details regarding the Government's proof that the children ingested the fentanyl that harmed them are set forth in the Government's Opposition to the Defendants' Motion to Dismiss the Controlled Substances Act's Death or Serious Bodily Injury Sentencing Enhancement (Dkt. 46).

[3] Kilo presses are used by narcotics traffickers to compress illegal narcotics into kilogram-sized "bricks" in preparation for distributing wholesale quantities of narcotics.

[4] A stamp is simply a logo narcotics traffickers put on their drugs in order to brand them for distribution.

fluorofentanyl, and heroin were found hidden inside the traps.  The Daycare was owned and operated by Mendez, and the defendant was the leaseholder on the unit.

### 4.  Witness Testimony

A cooperating witness ("CW-1"), will testify that the defendant, Mendez, and co-conspirator Renny Antonio Parra Paredes ("Parra Paredes") were running a large-scale drug packaging and distribution operation out of the Daycare.  In particular, CW-1 is expected to testify that in early 2023, CW-1 travelled from his then-residence in Philadelphia to the Bronx in order to visit the defendant and offer condolences concerning the death of the defendant's brother ("CC-1"), which had occurred several months earlier.  During that visit, the defendant explained to CW-1, in sum and substance, that CC-1 had been packaging narcotics when he died, that the defendant, Mendez, and Parra Paredes worked with him in trafficking narcotics, and that following CC-1's death the defendant took possession of some of the drugs and equipment used to package narcotics at CC-1's apartment.  During that same visit, the defendant also explained to CW-1 that narcotics were stored under the floor in the space that ultimately became the Daycare.[5]  Following this conversation, the defendant reached-out to CW-1 to attempt to recruit him to move to the Bronx and join the defendant's narcotics operation.

CW-1 ultimately decided to move to the Bronx and into the bedroom of the Daycare space in March of 2023, where he resided briefly—for approximately a month-and-a-half.  After about six months, and approximately three weeks before the poisoning incident on September 15, 2023, CW-1 moved back into the bedroom of the Daycare.  During both periods he resided in the bedroom of the Daycare, CW-1 witnessed the defendant, Mendez, and Parra Paredes packing drugs

---

[5] Although the defendant began leasing the apartment in which the Daycare was located at least as early as June 2022, the Daycare only opened in approximately June of 2023.

for distribution on numerous occasions.[6]  He also witnessed, among other things, that a fourth co-conspirator, Jean Carlo Amparo Herrera ("Amparo Herrera"), picked up drugs and dropped off money.[7]  CW-1 assisted in this operation, helping to clean-up the mess left from the packaging and occasionally purchasing supplies and making deliveries for the defendant, Mendez, and Parra Paredes.  CW-1 also assisted with packaging the drugs, but became very ill while doing so, and, therefore, not attempt to package product again.  CW-1 saw the defendant, Mendez, and Parra Paredes become ill from packaging the drugs on multiple occasions, but witnessed their commitment to the Daycare drug production facility as they persisted in their activity.  Notably, the defendant also once informed CW-1 that the defendant's own child—then a toddler—had become sick from the drugs after being in the Daycare space.  The defendant further advised CW-1 that the defendant and Mendez were afraid to bring the child to the hospital because they feared the child would test positive for drugs, though they ultimately did so.

**5. Evidence Concerning the Death of the Defendant's Brother**

Crime scene photographs and body camera footage of the Bronx apartment, located a little over a mile from the Daycare, where body of the defendant's brother, CC-1, was found on October 20, 2022, confirm that the defendant's narcotics conspiracy dated back to well before his brother's

---

[6] In addition to general testimony regarding drug distribution by the conspiracy and at the Daycare in particular, CW-1 is also expected to discuss several specific dates in which the defendant and others involved in the Daycare drug trafficking operation engaged in drug-related activities during September of 2023.  In particular, CW-1 will testify that the defendant and Parra Paredes engaged in packaging narcotics on the night of September 13, 2023, and that a co-conspirator dropped-off a kilogram of drugs on a particular date.  Surveillance footage of the area outside of the entrance to the Daycare will show behavior consistent with these activities on those dates.

[7] CW-1 is also expected to testify that on one occasion he and the defendant went to an apartment used by Amparo Herrera and CW-1 saw Amparo Herrera packaging drugs.  CW-1 was told to by the defendant to bring a change of clothes with him in case Amparo Herrera wanted CW-1 to stay and help package the narcotics.

death.  The defendant's brother died in a well-establish fentanyl mill; indeed, the crime scene photographs show glassines of narcotics consistent with the design of the glassines found in the Daycare as well as an abundance of narcotics packaging equipment including stamps, stamp pads, plastic bags, tape, and latex gloves.  At the time of his death, he was wearing latex gloves and a white powder could be seen on his legs.  Moreover, police-worn body camera footage from officers who responded to the crime scene shows that the primary individuals involved in the Daycare drug trafficking operation—the defendant, Mendez, and Parra Paredes—were all at the scene when NYPD arrived.  Furthermore, laboratory analysis revealed that the drugs found in CC-1's apartment contained the same mixture of controlled substances as the drugs found in the Daycare—fentanyl, para-fluorofentanyl, and heroin.

### 6.  The Search of Parra Paredes's Apartment

Approximately one week after the poisonings at the Daycare, law enforcement officers arrested Parra Paredes for his involvement in the Daycare narcotics operation.  At the time of his arrest, Parra Paredes had a set of keys to a particular apartment in the Bronx in his possession.  Law enforcement officers subsequently searched that apartment and discovered two bags of narcotics and narcotics packaging paraphernalia, along with identification belonging to Parra Paredes.  Among the items in the bags were glassines stamped with the label "Red Dawn." Glassines stamped with the same label were found during the September 21, 2023, search of the Daycare.

Text messages exchanged between the defendant and Parra Paredes following the poisonings at the Daycare suggest that the bags of drugs and drug-packaging paraphernalia found at Parra Paredes's apartment are the materials that the defendant removed from the Daycare as the children were sick and dying on the afternoon of September 15, 2023.  In particular, CW-1 will testify that he met up with the defendant at an apartment belonging to a particular individual ("CC-

2") after the poisonings at the Daycare.  Several days later, on September 21, 2023, the defendant texted Parra Paredes to "go see [CC-2] because that's where everything is at" and "before leaving I told [CC-2] that thing was yours."

### 7.  The Defendant's Flight

After fleeing the Daycare through the back door, with bags full of drugs, on September 15, 2023, the defendant hid-out at CC-2's apartment in the Bronx for a time before fleeing the state and ultimately the country.  The defendant was arrested by U.S. law enforcement officers on September 27, 2023, in San Diego, California, following his expulsion from Mexico by Mexican immigration authorities.

\*   \*   \*

The defendant has been charged in Superseding Indictment S1 23 Cr. 504 (JSR) with: (i) in Count One, conspiracy to distribute narcotics resulting in the death of Minor Victim-1 and serious bodily injury to Minor Victim-2, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A); (ii) in Count Two, possession with intent to distribute narcotics resulting in the death of Minor Victim-1, and aiding and abetting the same, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(A); and (iii) in Count Three, possession with intent to distribute narcotics resulting in serious bodily injury to Minor Victim-2, and aiding and abetting the same, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(A). (*See* Dkt. No. 41).

<u>**ARGUMENT**</u>

**I. Surveillance Footage Depicting the Minor Victims on September 15, 2023 Should be Admitted to Establish a Timeline of Events and Prove Minor Victim-2 Suffered Serious Bodily Injury.**

As described above, the Government expects to introduce surveillance footage at trial, including footage of the events of September 15, 2023, depicting the defendant entering and then fleeing the Daycare, and footage of prior dates in September 2023 in which the defendant can be seen engaging in drug-related activity on camara.  Included among the footage the Government seeks to introduce is three short sets of video clips that show the Minor Victims.  That footage is as follows: (1) three clips, approximately two minutes each, of the four children arriving at the Daycare the morning of September 15, 2023 (the "Dropoff Footage"), (2) one approximately fifteen second clip of Minor Victim-4 being picked-up from the Daycare by his mother around 12:50 p.m. on September 15, 2023 (the "Pickup Footage"); and (3) approximately five minutes of footage showing the sidewalk area outside of the Daycare in the immediate aftermath of the poisonings (the "Sidewalk Footage").

The Dropoff Footage shows each of the children being dropped off at the Daycare the morning of September 15, 2023.  The children all appear well and healthy, and the timestamps on the footage establish the time of drop-off for each child.  The Pickup Footage shows Minor Victim-4 being picked-up from the Daycare by his mother.  Minor Victim-4 appears very sleepy and can be seeing holding onto his mother and appearing to fall asleep on her shoulder.  The Sidewalk Footage begins a few minutes after the defendant has fled via the back of the Daycare, and demonstrates that Minor Victim-2, for whom the Government has charged serious bodily injury, was limp and appeared lifeless when emergency help arrived at the Daycare after the defendant fled the scene.  In particular, the Sidewalk Footage shows Mother-2 rushing inside of the Daycare and exiting moments later with a limp Minor Victim-2 in her arms.  Mother-2 can be seen on the

footage shaking Minor Victim-2 in an attempt to rouse him before handing him to EMT-2. The Sidewalk Footage also shows EMT-1 carrying Minor Victim-1, who also appears to be either sleeping or lifeless, from the Daycare. The Dropoff Footage, Pickup Footage, and the Sidewalk Footage are attached hereto as Exhibits A, B, and C, respectively (GX 915A, 915B, 915C, 915I, 915O).

The Dropoff Footage, Pickup Footage, and the Sidewalk Footage should be admitted because they (1) establish a timeline of events relevant to how the children were poisoned, and (2) establish the serious bodily injury suffered by Minor Victim-2, which is an element of Counts One and Three of the S1 Indictment.

## A. Applicable Law

Under Rule 402 of the Federal Rules of Evidence, "relevant evidence is admissible" at trial unless its admission is otherwise prohibited. Fed. R. Evid. 402. "[R]elevant evidence" is evidence having "any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action." Fed. R. Evid. 401. Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997). Rather, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.* Rule 403 authorizes the exclusion of relevant evidence only if its "probative value is substantially outweighed by [the] danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that is not the same as being "unfairly" prejudicial under Rule 403. *See Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000). As the Second Circuit has stated, "all evidence incriminating a defendant is, in one sense of the

11

term, 'prejudicial' to him: that is, it does harm to him" and in "that sense, the more pertinent evidence is, the more prejudicial it is," but "[w]hat 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'" *United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986) (emphasis in original).  Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).  Evidence that is neither "more sensational" nor more "disturbing" than the charged crimes will not be deemed unfairly prejudicial.  *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

### B.  Discussion

The Dropoff, Pickup, and Sidewalk Footage should be admitted at trial.  The Dropoff Footage is relevant because it shows that the children appeared well when they arrived at the Daycare on September 15, 2023.  Additionally, through testimony and both the Dropoff and Pickup Footage, the Government intends to establish that the children were poisoned while at the Daycare the morning of September 15, 2023.  The children were well when they were dropped-off, but by the time Minor Victim-4 was picked-up on the Pickup Footage, they were ill.  The timestamp on the Dropoff footage also establishes a specific timeline for the arrival of the children.[8]  That timeline plays an important role in establishing when and how the children initially suffered the drug poisoning.  For example, as one of the Government's testifying toxicologists will explain, the relatively short time the children were at the Daycare before becoming ill suggests that dermal absorption of the fentanyl that harmed them was unlikely because fentanyl requires an extended

---

[8] Note that the timestamp is off from the actual time by approximately 11 minutes and 20 seconds. That is, it is approximately 11 minutes and 20 seconds fast.

period of time to be absorbed by the skin.  Time periods are thus highly probative and relevant for the jury's consideration.

The Sidewalk Footage should also be admitted.   First, the Sidewalk Footage is unquestionably relevant.  Because the footage clearly depicts Minor Victim-2's injuries at as close a time as possible to when the injuries were discovered, it is highly probative of the nature and extent of the harm suffered by Minor Victim-2, which is an element of Counts One and Three of the S1 Indictment.  Indeed, it is particularly probative because, as an emergency room physician for Minor Victim-2 is expected to testify, Minor Victim-2 was quickly revived once he was given Narcan in the emergency room.  Thus, the video footage makes clear that although Minor Victim-2 was quickly revived upon receiving medical treatment, before being administered Narcan, his condition was extremely serious.   In short, the Sidewalk Footage is highly relevant and incontrovertible evidence of the extent of the injuries suffered by Minor Victim-2.  Moreover, the Sidewalk Footage definitively establishes the timeline of events on September 15, 2023.  The footage starts just minutes after the defendant fled the scene from the back of the Daycare, and clearly establishes that the defendant's flight preceded the arrival of emergency medical personnel—a fact highly relevant to the reason the defendant was running out the back of the Daycare (that is, deliberately avoiding first responders and, necessarily, law enforcement) and important for establishing his consciousness of guilt.

The Sidewalk Footage is not unfairly prejudicial under Rule 403.  Although the footage— depicting the near-death experience of a minor child—is upsetting, it is not particularly gruesome or shocking.  *See e.g., United Stats v. Salameh,* 152 F.3d 88, 122-23 (2d Cir. 1998) (affirming the admission of photographs of victims killed in the World Trade Center bombing, including an obviously pregnant woman, and explaining that "[p]robative evidence is not inadmissible solely

because it has a tendency to upset or disturb the trier of fact"); *United States v. Kuo Chen*, No. 10-CR-671 (S-1) (KAM), 2011 WL 197585, at *2 (E.D.N.Y. Jan. 11, 2011)  (photographs of the injured victim were not "so gruesome or shocking as to warrant exclusion" of highly relevant evidence).  The Sidewalk Footage is not intended to inflame or prejudice the jury, but rather to set forth the timeline of events of September 15, 2023 and serve as the best evidence of the injuries suffered by Minor Vicitm-2.  The Government will argue from this evidence that the defendant, who was in the Daycare for a period of approximately two minutes before beginning his flight, was on notice of the injuries to the children, in particular Minor Victims-1 and -2, and reacted by collecting evidence of the drug conspiracy and fleeing the scene.  The defendant's rapid reaction to the situation demonstrates his knowledge of and commitment to the drug conspiracy. Furthermore, the defendant is charged with operating a narcotics operation out of a Daycare that resulted in the death of Minor Victim-1 and serious bodily injury to Minor Victim-2.  The evidence presented in the form of the Sidewalk Footage is not "more sensational" or more "disturbing" than the crimes charged: it is core to the charged conduct and relevant to elements of the offenses—the serious bodily injury and death suffered by the victims.  *See Roldan-Zapata*, 916 F.2d at 804.

Accordingly, the Court should allow the Dropoff Footage, the Pickup Footage, and the Sidewalk Footage to be admitted into evidence.

**II.    Testimony and Photographs from the Parents of the Minor Victims Demonstrating that the Children Had Previously Behaved Strangely After Returning Home from the Daycare Should Be Admitted To Establish the Defendant's Continual Use of the Daycare as a Drug Distribution Facility and the Existence and Conduct of the Conspiracy.**

The Government also seeks to introduce testimony from the parents of the Minor Victims, in particular, from Mother-2, regarding unusual behavior that they observed their children exhibit after being picked up from the Daycare prior to the September 15, 2023 poisonings that is consistent with additional exposure to opioids.  Specifically, the Government expects that Mother-

14

2 will testify that Minor Victim-2, among other behaviors, sometimes drooled, banged into walls, and was dizzy when he arrived home from the Daycare, behavior that was both out of the ordinary for Minor Victim-2 as well as behavior that Mother-2 only observed when Minor Victim-2 attended the Daycare.   In addition, the Government expects that Mother-2 will testify that approximately one week before the September 15, 2023 poisonings, Mendez sent her a photo of Minor Victim-2 and Minor Victim-2's younger sibling, Minor Victim-3, asleep at the Daycare (the "Photo").   The Government expects Mother-2 to state that she found the photo very unusual because her children did not typically sleep on their backs with their limbs extended, as they are depicted sleeping in the Photo.   The Government also seeks to admit the Photo into evidence; it is attached hereto as Exhibit D (GX 1601).

The Court should admit the above testimony from Mother-2 and the Photo, because they are evidence that Minor Victim-2 was previously poisoned by fentanyl, even if Minor Victim-2 had not overdosed to the point of being non-responsive.   This prior poisoning demonstrates that the defendant stored narcotics in the Daycare over an extended period, and as a result the narcotics impacted Minor Victim-2.   The prior poisonings are also evidence indicating that Minor Victim-2's serious bodily injury on September 15, 2023, resulted from poisoning at the Daycare, and not some other source.   Moreover, the probative value of this testimony outweighs any potential prejudice.   *See* Fed. R. Evid. 403.   Mother-2's testimony and the Photo are neither "more sensational" nor more "disturbing" than the crimes with which the defendant is charged.   *Roldan-Zapata*, 916 F.2d at 804.   While this evidence speaks to Minor Victim-2 becoming sick at the Daycare, it is conduct that occurred during the period of the charged conspiracy, and it is not more sensational or disturbing than the serious bodily injury that the defendant's conduct caused Minor Victim-2 on September 15, 2023.

### III. Statements Made by Mendez on Body Camera Footage when Emergency Personnel Arrived at the Daycare Should Be Admitted To Establish a Timeline of Events Relevant to How the Minor Victims Were Poisoned by Narcotics.

Approximately six minutes after EMT-1 and EMT-2 arrived at the Daycare on September 15, 2023, NYPD officers wearing body-worn cameras arrived at the scene.  Two of those officers quickly entered the Daycare and began speaking with Mendez to attempt to understand the situation.  At this point in the investigation, law enforcement officers were still ascertaining how many children had been impacted and where their parents were.  On the body camera footage of those officers, Mendez can be heard explaining,[9] in sum and substance, that the children were sleeping and when she tried to wake them up from a nap, they were not responsive.[10]  Mendez also indicates that one child was sleeping on a mat in the hallway of the Daycare and that another was sleeping in the playroom.  When Mendez first starts speaking with the officers, she appears to be crying and bystanders can be heard urging her to calm down.  The total length of the footage the Government seeks to introduce is approximately two minutes.

Mendez's statements on the body camera footage are relevant evidence as to how the children ingested fentanyl at the Daycare.  They help to establish the timeline of events by establishing that the children experienced the drug poisoning simultaneously, that Mendez first noticed that the children were ill at the conclusion of their nap, and that the children were sleeping in separate areas of the Daycare (constituting powerful evidence that the exposure was not from

---

[9] Mendez's statements are in Spanish.  References herein are based on preliminary translations and will be finalized for trial with the assistance of a court certified Spanish-language interpreter.  The Government will provide the translation to the Court as soon as it is available.

[10] The body camera footage at issue is attached hereto as Exhibit E (GX 902A; 902B).  The Government seeks only to introduce the portion of the footage marked as GX 902A, but includes the longer GX 902B so that the Court can see the full circumstances under which Mendez's statements were made and the state of emergency that existed at that time.

the air or a particular dermal exposure, but, rather, a common source of consumption—lunch before the nap).

Mendez's statements squarely fall within the excited utterance exception to the hearsay rule.  *See* Fed. R. Evid. 803(2) (statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness).  And they do not run afoul of the Confrontation Clause.  Mendez's statements were made to officers within the first few minutes of NYPD arriving on a chaotic scene of ambulances, parents, and bystanders.  At this point, in the heat of a significant emergency—the poisoning of multiple children at a daycare center—officers were simply attempting to determine what had happened and how to address the situation.  As such her statements are non-testimonial under the Sixth Amendment.  See *Davis v. Washington*, 547 U.S. 813, 822 (2006) (statements "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" are not testimonial).

Accordingly, the Government respectfully requests that the body camera footage attached hereto as Exhibit E be admitted at trial.

## IV.  Certain Text and Voice Messages Furthering the Goals of the Narcotics Conspiracy Exchanged Among Co-Conspirators Approximately Four Months Prior to the Date of the Charged Conspiracy Should Be Admitted to Prove the Existence and Conduct of the Conspiracy.

The Government expects to present evidence of certain text and voice messages exchanged among the members of the Daycare drug trafficking conspiracy at trial.[11]  Among the text and

---

[11] Those messages will all either not constitute hearsay, be statements of the defendant, or co-conspirator statements in furtherance of the conspiracy.  *See* Fed. R. Evid. 801(d)(2)(A) & (E).

voice messages the Government seeks to present are five sets of exchanges of text and voice messages between the defendant and Mendez from June 2022 up to October 2022, the beginning period of the conspiracy set forth in the Indictment. *See* S1 Indictment, Count One ("From at least in or about October 2022 . . ."). Those exchanges are set forth in their entirety in Exhibit F (GX 1420, 1420-T, 1425, 1425-T, 1426, 1426-T, 1427, 1427-T, 1428, 1428-T), excerpts of the exchanges are discussed below.

Many of the exchanges involve conversations about narcotics and their packaging. For example, on July 5, 2022, Mendez and the defendant (listed as the contact "My Rey" in Mendez's phone) exchanged the following messages:[12]

| | |
|---|---|
| Mendez: | Love |
| Mendez: | This is supposed to be more |
| Mendez: | Money |
| Mendez: | Because they're 20's and 10's |
| [Defendant]: | Right |
| [Defendant]: | That's true |
| [Defendant]: | When the white bags |
| [Defendant]: | The packages |
| [Defendant]: | There has to be 23 of the white ones |
| Mendez: | Figure out your thing correctly |
| [Defendant]: | Count the packages of 10 that are there |
| Mendez: | They say its more money |

(GX 1426, 1426-T). A few days later, on July 12, 2022, the defendant and Mendez had the following exchange:

| | |
|---|---|
| Mendez: | How much is it |
| Mendez: | In total |
| [Defendant]: | 1400 |
| Mendez: | For this |
| [Defendant]: | You told me 700 and 700 |
| [Defendant]: | 700 in 20's |
| [Defendant]: | And 700 in 10's |
| Mendez: | OK |

---

[12] The messages are in Spanish; the text here is a translation from a certified court interpreter.

18

(GX 1425, 1425-T).  And on September 2, 2022, the following exchange occurred between the
defendant and Mendez:

| | |
|---|---|
| [Defendant]: | Good morning, love |
| [Defendant]: | Listen bring me the package of small bags |
| [Defendant]: | That's in my t-shirt |
| Mendez: | OK |

(GX 1427, 1427-T).  In each of the foregoing exchanges, the defendant and Mendez are plainly

discussing the narcotics business, in conversations regarding quantities of packaged narcotics and

payment.  Notably, the apparent references to packaging ("the white bags / packages" and "small

bags") appear to match the packaging recovered during both the search of the Daycare and Parra

Paredes's apartment.  The meaning of these messages is unambiguously related to the means and

methods of the narcotics conspiracy that was discovered by law enforcement after the September

15, 2023 poisonings.

Other sets of the text exchanges appear to involve conversations between the defendant

and Mendez about the conduct of the conspiracy as it operated at the Daycare, which was located

on the basement level of a building adjoining the building in which Mendez and the defendant

resided in a second-floor apartment.  For example, on August 26, 2022, the following exchange

occurred, in which the defendant asked Mendez to look out the window of their apartment to see

if there were any police outside of the Daycare, presumably because the defendant was engaging

in drug-related activities within the Daycare space.[13]

| | |
|---|---|
| [Defendant]: | Love, look |
| [Defendant]: | Out the window |
| Mendez: | OK |
| [Defendant]: | And tell me if you see a lot of cops |

---

[13] Again, the Daycare did not open until approximately June of 2022, so at this time there was not
actually a daycare located in what ultimately became the Daycare's space; the space was simply a
basement apartment.

| | |
|---|---|
| Mendez: | No |
| Mendez: | They already left |
| [Defendant]: | Ok |
| Mendez: | There's one but he's on the corner |
| [Defendant]: | Take a good look |
| Mendez: | He's right by your door |
| Mendez: | Now |
| Mendez: | There are two of them |
| [Defendant]: | Ok |

(GX 1420, 1420-T).  Similarly, on September 9, 2022, the following exchange occurred in which the defendant told Mendez not come down to the Daycare space with the baby because he had to "grind" something.  As one of the Government's experts will testify, grinding narcotics is often one of the steps in the process of packaging narcotics for distribution:

| | |
|---|---|
| Mendez: | Can I come down |
| Mendez: | Down there with the baby |
| [Defendant]: | I have to grind something |
| Mendez: | OK |
| [Defendant]: | And Boquilla is supposed to come over |
| [Defendant]: | Better later |
| [Defendant]: | You know how loud that guy is |

(GX 1428, 1428-T).

These messages evidence the defendant's involvement in drug trafficking in the same location (the Daycare space), with the same people (Mendez).  They are thus merely a continuation of the conspiracy alleged in the S1 Indictment and constitute direct evidence of Count One.  The Second Circuit has noted that it has "held repeatedly that it is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged . . . or to explain the mutual trust that existed between coconspirators." *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993).  Moreover, the indictment describes the conspiracy as beginning from "*at least* October 2022" (emphasis added), and these messages occur a mere four months or less before that date.  It is well-settled that dates in an indictment are approximate and that the dates in an

indictment need only be substantially similar to the dates established at trial.  *See United States v. Teague*, 93 F.3d 81, 83-84 (2d Cir. 1996).

Accordingly, the Government respectfully requests that this series of exchanges between the defendant and Mendez be admitted a trial.

## V.   Limited Evidence Concerning the October 20, 2022 Death of the Defendant's Brother, CC-1, Should Be Admitted to Prove the Extended Duration of the Conspiracy and the Defendant's Involvement in that Entire Duration.

As set forth above, the Government seeks to present limited evidence at trial regarding the death of the defendant's brother, CC-1, on or about October 20, 2022 at an apartment in the Bronx. The evidence the Government seeks to present includes:  (i) the testimony of one NYPD officer who responded to the scene of CC-1's death; (ii) photographs taken by law enforcement of the apartment in which CC-1's body was found; (iii) screenshots of body camera footage depicting the defendant, Mendez, and Parra Paredes present at the scene where CC-1's body was found; and (iv) the results of the laboratory testing conducted on the controlled substances found at the scene of CC-1's death.[14]  Notably, the Government does not currently seek to introduce additional evidence regarding CC-1's drug poisoning death, such as OCME's determination of the cause of CC-1's death (fentanyl intoxication), any autopsy photos or photos of CC-1's body at the scene, or testimony of any other law enforcement witnesses beyond the testimony of <u>one</u> responding officer.  The evidence the Government seeks to introduce is narrowly tailored and constitutes direct evidence of the conspiracy, which the Government contends existed before CC-1's death

---

[14] The photographs and clip of body-worn camera footage the Government seeks to introduce are attached hereto as Exhibit G (GX 1302A-E, 1305, 1308, 1309, 1310, 1311, 1312, 1313, 1314, 1317, 1319, 1320, ).

including, as noted above, during the period of time when the defendant and Mendez were discussing in text messages drug packaging, payment, and alertness to police.

As explained above, CW-1 is expected to testify that in early 2023, the defendant explained to CW-1 that CC-1 had been packaging narcotics when he died, that the defendant, Mendez, and Parra Paredes worked with him in trafficking narcotics, and that following CC-1's death the defendant took possession of some of the drugs and equipment used to package narcotics at CC-1's apartment and brought them to the Daycare. Additionally, the physical evidence at the scene of CC-1's death strongly suggests a connection between the narcotics operation found in that apartment and the narcotics operation at the Daycare. In particular, the packaging of the drugs found at the scene of CC-1's death is consistent with the packaging materials found at the Daycare. More specifically, both the drugs packaged at CC-1's apartment and the Daycare were packaged in small glassines marked with a red stamp. Furthermore, the chemical analysis of the drugs at CC-1's apartment shows that the drugs present contained the same lethal mix of para-fluorofentanyl, fentanyl, and heroin that was found at the Daycare. Accordingly, the evidence the Government seeks to present from the scene of CC-1's death is simply direct evidence of the conspiracy—a conspiracy that spanned multiple years and multiple locations. To the extent CW-1 learned information regarding CC-1's poisoning from the defendant, the evidence is also plainly admissible as the statements of a party opponent under Rule 801(d)(2)(A), and as co-conspirator statements in furtherance of the conspiracy under Rule 801(d)(2)(E).

## VI.   Testimony from CW-1 and Voice Message Evidence Concerning the Potential Exposure of the Defendant's Minor Child to Controlled Substances in the Daycare Space Should be Admitted to Prove the Existence and Conduct of the Conspiracy.

The Government will seek to elicit testimony from CW-1 regarding a conversation CW-1 had with the defendant during which the defendant told him that his and Mendez's minor child became sick while in the Daycare space. More specifically, the Government anticipates that CW-

1 will testify that: (i) the defendant told CW-1 that at one point the defendant's son (who was, at that time, under age two) became sick in the Daycare; (ii) the defendant believed that the narcotics that he was storing in the Daycare made his son sick; (iii) the defendant and Mendez took their son to the hospital; and (iv) the defendant was concerned that the child would test positive for drugs at the hospital.  CW-1 understood the defendant to mean that a positive drug test would result in consequences that could reveal the defendant's involvement in the drug conspiracy.  In addition, the Government expects to offer into evidence audio—as well as translations—of three recorded voice messages exchanged between Mendez and co-conspirator Amparo Herrera, corroborating that the defendant and Mendez's son also suffered fentanyl exposure and poisoning in the Daycare. In these messages, Mendez, among other things, states: (i) that her son ate something "down there," which the Government will argue refers to the Daycare; (ii) that what he ate "down there" made him sick; (iii) that the defendant and Mendez's son was "down there" for "a while" the previous night; (iv) that the defendant and Mendez's son was vomiting; and (v) that the defendant and Mendez took their child to the hospital.  *See* Ex. H (GX 1430, 1430-A.1, 1430-A.1-T, 1430-A.2, 1430-A.2-T, 1430-A.3, 1430-A.3-T, 1430-A.4, 1430-A.4-T).

### A.  Applicable Law

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's coconspirator during and in furtherance of the conspiracy."  To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy.  *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the

circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). To be "in furtherance" of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy. Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a coconspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they, for example: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158; (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; (6) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his co-conspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994).

## B. Discussion

With respect to CW-1's testimony regarding the defendant's statements to him about the defendant's and Mendez's child becoming ill after being in the Daycare space, those statements are clearly admissible as statements of a party opponent under Rule 801(d)(2)(A).

With respect to the recorded voice exchanges the Government seeks to play, those messages are admissible as co-conspirator statements in furtherance of the conspiracy under

801(d)(2)(E).  Both Mendez and Amparo Herrera were members of the conspiracy.  Mendez

assisted in packaging narcotics and established the cover for the narcotics trafficking operation—

the Daycare.  With respect to Amparo Herrera, CW-1 is expected to testify that during CW-1's

limited time living in the Daycare space, he observed CW-1 pick-up drugs and drop off money,

and on one occasion he witnessed Amparo Herrera packaging drugs.  Indeed, on that occasion the

defendant directed CW-1 to bring a change of clothes with him when the defendant and CW-1

went to visit Amparo Herrera's apartment so that, if necessary, CW-1 could stay and help Amparo

Herrera package narcotics.  CW-1's testimony clearly establishes that the defendant's messages

about their child exhibiting symptoms of fentanyl poisoning while being in the Daycare and

Mendez and the defendant's fear that he would test positive for narcotics, at a minimum updated

the conspirators as to potential risks of detection and law enforcement involvement.  Similarly, the

voice exchanges at issue are one co-conspirator (Mendez) informing another co-conspirator

(Amparo Herrera) of that development in the conspiracy.  Thus, Mendez's statements inform

Amparo Herrera of the status of the conspiracy, and warn him of the dangers associated with the

substance the co-conspirators are handling in the conspiracy.  As such, they are admissible as co-

conspirator statements.  *See United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001).

### VII.  Evidence Concerning the Defendant's Flight Prior to Arrest Should Be Admitted To Provide Evidence of the Contents of the Bags the Defendant Removed from the Daycare and Demonstrate the Defendant's Consciousness of Guilt and Involvement in the Conspiracy.

At trial, the Government intends to introduce four categories of evidence showing the

defendant fled the Bronx, New York, and, eventually, the country, beginning immediately after

the poisonings at the Daycare on September 15, 2023.  First, the Government intends to introduce

surveillance footage captured on September 15, 2023, depicting the defendant rushing into the

front entrance of the Daycare, exiting from the back of the Daycare while carrying two weighted

bags, climbing through bushes, and fleeing the scene.  Second, the Government intends to elicit testimony from CW-1 that he and the defendant met at CC-2's apartment after the defendant fled from the Daycare.  The Government expects CW-1 to state that CC-2 was also involved in the narcotics business.  Third, the Government expects to call a Deputy United States Marshal (the "Marshal") to testify that United States law enforcement apprehended the defendant at the U.S.-Mexico border in San Diego, California after the defendant was expelled from Mexico by Mexican immigration authorities.  Finally, the Government expects to introduce text messages the defendant sent in the days following the September 15, 2023 poisonings indicating that he had fled, suggesting that he had visited CC-2 in the course of fleeing, and inquiring whether his co-conspirator Parra Paredes had succeeded in removing their narcotics from the Daycare.  These messages include the following, all sent by the Defendant:[15]

September 20, 2023:  I can't talk yet, but I still have about 2 hours and change to go.

September 20, 2023:  I'll call you as soon as I'm at the place.

September 21, 2023:  And go see [CC-2] because that's where everything is at.

September 21, 2023:  This makes me want to turn myself in, buddy, I think it would be better that way[.]

September 21, 2023:  And all our things . . . did you get them out at least?

September 25, 2023:  I'm tired of asking Him . . . to perform the miracle of me coming out unscathed from all this

*See* Ex. I (GX 1401, 1401-T, 1432, 1432-T, 1434-1434-T, 1435, 1435-T, 1436, 1436-T).

---

[15] The messages are all originally in Spanish; the quotations above are from translations by court-certified interpreters.  All of the messages quoted except the first and last were exchanged with Parra Paredes.

### A. Applicable law

"It is well-settled that flight can, in some circumstances, evidence consciousness of guilt." *United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005); *see United States v. Steele*, 390 F. App'x 6, 12 n. 2 (2d Cir. 2010) ("[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.") (quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)) (internal quotation marks omitted); *United States v. Ulbricht*, 79 F. Supp. 3d 466, 489 (S.D.N.Y. 2015) (same). This evidence is admissible as "direct evidence [of the charge], as it shows consciousness of guilt." *See United States v. Hatfield*, 685 F. Supp. 2d 320, 327 (E.D.N.Y. 2010). In order to be admissible, evidence must meet the four-step test set forth in *Al-Sadawi*, which requires that the evidence support four inferences: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." 432 F.3d at 424. These requirements "ensure[ ] that the evidence is probative in a legal sense and protects the defendant against the possibility of the jury drawing unsupported inferences from otherwise innocuous behavior." *United States v. Amuso*, 21 F.3d 1251, 1258 (2d Cir. 1994). Evidence of flight, however, is not to be excluded just because the evidence "might be subject to varying interpretations." *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004).

### B. Discussion

The evidence of the defendant's flight is admissible as direct proof of his consciousness of guilt and easily satisfies the four-step test set forth in *Al-Sadawi*. There is no question that the defendant's behavior in this case constitutes flight. Moments after Mendez called the defendant, the defendant ran inside the Daycare, collected weighted bags, and fled the scene. In addition, the

defendant explicitly stated that he was contemplating turning himself in, proving that, at the time he had sent the message, he was knowingly evading law enforcement as a fugitive.   In other messages the defendant states that he is unable to speak because he is approximately two hours from "the place."   All of those messages demonstrate that the defendant is on the run.

There similarly is no doubt that the defendant's behavior evidences consciousness of guilt and, in addition, consciousness of guilt for the crimes with which he is charged.   Indeed, the evidence of the defendant's flight includes messages in which the defendant asks the co-conspirator whether he has succeeded in removing "all of [their] things"; given the timing of the message and the context in which he sends it, this is a clear reference to the narcotics that were found in the Daycare during the second search, demonstrating that the defendant was aware there were substantial quantities of narcotics that were not removed from the Daycare at the time of his flight.

Moreover, the text message evidence between the defendant and Parra Paredes, combined with law enforcement's subsequent discovery of bags containing narcotics and drug paraphernalia matching that which was found in the Daycare in the apartment in which Parra Paredes was hiding out, suggests that the bags the defendant removed from the Daycare contained narcotics and those very same narcotics packaging materials. CW-1's anticipated testimony about the defendant meeting with CC-2 after running from the Daycare, the defendant's messages questioning whether he should turn himself in, and the defendant's inquiries as to whether the supply had been removed from the Daycare make clear that the defendant's flight was because of his consciousness of guilt for the September 15, 2023 poisonings.   Indeed, the defendant's messages demonstrate he was continuing his involvement in the conspiracy despite the fact of the poisonings.

Finally, this evidence is plainly relevant under Rule 401.  The defendant's consciousness of guilt and ensuing flight is highly probative:  he fled because he knew that he had narcotics in the Daycare and understood how the children were poisoned.  He sought to remove that evidence before law enforcement officers could find it and, once they had discovered that the children were harmed from narcotics exposure, the defendant fled the area.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
         May 28, 2024

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                        By:     s/_____
                                        Brandon Thompson
                                        Maggie Lynaugh
                                        Justin Rodriguez
                                        Assistant United States Attorneys
                                        (212) 637-2444 / 2448 / 2591

                                        Karl Miller
                                        Special Assistant United States Attorney
                                        (212) 637-2225