UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                      :

UNITED STATES OF AMERICA         :        S4 23 Cr. 504 (JSR)

                                   :

            -v.-                  :

                                   :

GREI MENDEZ,                     :

                                 :

                  Defendant.    :

                                 :
-------------------------------------------------------------x


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


                                        DAMIAN WILLIAMS
                                          United States Attorney
                                          Southern District of New York


Maggie Lynaugh
Brandon C. Thompson
Alexandra Rothman
Assistant United States Attorneys

Karl Miller
Special Assistant United States Attorney
    *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT .................................................................................................................... 8

    I. Surveillance Video Depicting the Minor Victims on September 15, 2023 Should be Admitted to Establish a Timeline of Events, Prove Minor Victim-2 Suffered Serious Bodily Injury, and Show the Defendant's Behavior in the Wake of the Poisonings .......................... 8

        A.    Applicable Law ........................................................................................ 9

        B.    Discussion ............................................................................................. 10

    II. Limited Evidence Concerning the October 20, 2022 Death of the Defendant's Brother-in-Law, CC-1, Should Be Admitted to Prove the Extended Duration of the Conspiracy and the Defendant's Involvement in that Entire Duration. ........................................ 13

    III. Certain Text and Voice Messages are Admissible as Statements of a Party Opponent or Co-Conspirator Statements in Furtherance of the Conspiracy. ............................... 14

        A.    Applicable Law ...................................................................................... 14

    IV. The Court Should Admit a Voice Message in Which the Defendant States that Running a Daycare is Not Her "Thing" .................................................................................... 21

    V. The Court Should Preclude Evidence and Argument Concerning the Potential Punishment or Consequences of Conviction ................................................................................. 21

    VI. The Court Should Preclude Evidence of Good Acts ............................................. 22

        A.    Applicable Law ...................................................................................... 22

        B.    Discussion ............................................................................................. 23

CONCLUSION ............................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................................................ 14,

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ................................................................... 10

*Rogers v. United States*, 422 U.S. 35 (1975) .............................................................................. 22

*Shannon v. United States*, 512 U.S. 573 (1994)......................................................................... 22

*United States v. Avenatti*, 19 Cr. 374 (JMF) (S.D.N.Y. Jan. 13, 2022) ..................................... 22

*United States v. Bailey*, 444 U.S. 394 (1980) ............................................................................. 23

*United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir. 1990) ......................................................... 23

*United States v. Bankman-Fried*, 22 Cr. 673 (LAK), (S.D.N.Y. Sept. 26, 2023) ....................... 23

*United States v. Barrow*, 400 F.3d 109 (2d Cir. 2005) ......................................................... 24, 26

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001) ......................................................... 16, 20

*United States v. DeVillio*, 983 F.2d 1185 (2d Cir. 1993)............................................................ 15

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)..................................................................... 16

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ........................................................... 10

*United States v. Flaharty*, 295 F.3d 182 (2d Cir. 2002) ............................................................ 16

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) .......................................................... 14, 15

*United States v. Gomez*, 210 F. Supp. 2d 465 (S.D.N.Y. 2002) ................................................. 25

*United States v. Gonzalez*, 110 F.3d 941 (2d Cir. 1997) ............................................................. 9

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) ................................................................ 14

*United States v. Jefferson*, 215 F.3d 820 (8th Cir. 2000)........................................................... 16

*United States v. Jimenez*, 789 F.2d 167 (2d Cir. 1986) ............................................................. 10

*United States v. Kendall*, 665 F.2d 126 (7th Cir. 1981).............................................................. 15

*United States v. Kwong*, 69 F.3d 663 (2d Cir. 1995).................................................................. 23

*United States v. Kuo Chen*, 10 Cr. 671 (KAM) (E.D.N.Y. Jan. 11, 2011)............................12

*United States v. Liranzo*, 944 F.2d 73 (2d Cir. 1991) .................................................... 24

*United States v. Lyle*, 919 F.3d 716 (2d Cir. 2019) ....................................................... 24

*United States v. Lyles*, 593 F.2d 182 (2d. Cir. 1979) .................................................... 15

*United States v. Lozano-Reyes*, 101 F.3d 686 (2d Cir. 1996)....................................16

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)........................... 16

*United States v. Mezzanatto*, 513 U.S. 196 (1995) .................................................... 25

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) ................................................. 23

*United States v. Padilla*, 203 F.3d 156 (2d Cir. 2000)................................................ 15

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997)..................................................... 23

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) ................................................. 16

*United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989) ............................................... 16

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994).................................................... 15

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ............................ 10, 12

*United States v. Rosemond*, 841 F.3d 95 (2d Cir. 2016)........................................ 24, 26

*United States v. Simmons*, 923 F.2d 934 (2d Cir. 1991) ............................................. 16

*United States v. Stratton*, 779 F.2d 820 (2d Cir. 1985) .............................................. 15

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988)...................................... 15

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ...................................................... 16

*United States v. Ulbricht*, 79 F. Supp. 3d 466 (S.D.N.Y. 2015).................................. 15

*United States v. Velez*, 354 F.3d 190 (2d Cir. 2004).............................................. 24, 25

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) ............................................... 23

*United Stats v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ................................................. 12

**Rules**

Fed. R. Evid. 104(a) ............................................................................................ 14

Fed. R. Evid. 401 ................................................................................................. 9

Fed. R. Evid. 402 ............................................................................................. 9, 22

Fed. R. Evid. 403 ......................................................................... 9, 10, 11, 22, 23

Fed. R. Evid. 801(d)(2)(A) ......................................................................... 14, 16, 21

Fed. R. Evid. 801(d)(2)(E) ....................................................................... 1, 14, 15, 16

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in support of its motions *in limine* seeking rulings on the following requests with respect to the upcoming trial of defendant Grei Mendez ("Mendez" or "the defendant"), which is set to begin on November 4, 2024:

1. To admit surveillance footage showing the child-victims on September 15, 2023 for the purpose of: (1) establishing a timeline of events, (2) proving the serious bodily injury suffered by Minor Victim-2, and (3) showing the defendant's actions and behavior in the wake of the poisonings.[1]

2. To admit limited evidence concerning the October 20, 2022 death of the defendant's brother-in-law in an apartment filled with narcotics and narcotics-packaging equipment, in order to provide background to the conspiracy, and prove the extended duration of the conspiracy and the defendant's involvement for the entirety of that duration.

3. To admit certain text and voice messages as statements of a party opponent or co-conspirator statements made in furtherance of the conspiracy pursuant to Fed. R. Evid. 801.

4. To admit a voice message in which the defendant states that running a daycare is not her "thing" in order to prove that the defendant's daycare was a cover for the narcotics operation.

5. To preclude evidence or argument by the defendant concerning the potential punishment or consequences of conviction.

6. To preclude evidence or argument by the defendant concerning her prior good acts.

████████████████████████████████████████

---

[1] The terms Minor Victim-1 and Minor Victim-2 are used as they are defined in the S4 Indictment. That is, Minor Victim-1 is the child whose death is charged in Counts One and Two of the S4 Indictment; Minor Victim-2 is the child whose serious bodily injury is charged in Counts One and Three. Minor Victim-3 and Minor Victim-4 are used in this motion, but are not terms defined in the S4 Indictment. Minor Victim-3 and Minor Victim-4 were also present at the Daycare on September 15, 2023. As further described below, Minor Victim-3 is the sibling of Minor Victim-2 and the youngest of the children injured at the Daycare; Minor Victim-4 is the child who was picked-up by his parents at approximately 12:50 p.m. on September 15, 2023.

## BACKGROUND

On September 15, 2023, at approximately 2:40 p.m., emergency personnel were called to Divino Niño Daycare (the "Daycare") in the Bronx, which was a daycare owned and operated by the defendant.  When emergency personnel arrived, they found three children: Minor Victims-1 and -2, both boys approximately two years old, and Minor Victim-3, a girl approximately eight months old.  Minor Victims-1 and -2 were unresponsive.  All three children were rushed to the hospital.  Despite intensive medical intervention, Minor Victim-1 was declared dead shortly after arrival.  The medical examiner has determined his cause of death to be acute fentanyl intoxication. The other two children—one of whom was in respiratory arrest—were hospitalized, treated, and ultimately survived.  All were found to have fentanyl in their systems.  Minor Victim-4, a two-year-old boy who had been picked up by a parent from the Daycare approximately two hours before emergency services were called, was also rushed to the hospital after Minor Victim-4's parents realized that he was gravely ill.  Like the others, Minor Victim-4 had opioids in his system. He was treated and survived. The children were poisoned by fentanyl because, as investigators subsequently learned, the defendant and her co-conspirators chose to operate a large-scale fentanyl packaging and distribution facility inside the Daycare.

### 1.  The Timeline of Events at the Daycare on September 15, 2023

Mendez operated the Daycare out of a small, one-bedroom basement apartment in the Bronx.  The apartment consisted of a playroom for the children, as well as a bathroom, kitchen, and bedroom. Mendez lived in a building adjoining the building in which the Daycare was located with, among others, her husband and co-conspirator Felix Herrera Garcia ("Herrera Garcia") and co-

conspirator Renny Parra Paredes ("Parra Paredes").[2]  Mendez held the license to operate the daycare; Herrera Garcia was the leaseholder for the apartment unit in which the Daycare was located.

On the morning of September 15, 2023, between approximately 8:25 and 8:45 a.m., all four children who attended the Daycare were dropped-off by their parents.  All were healthy at the time of their arrival.  After the children engaged in morning activities, Mendez fed the children lunch and put three of them down for a nap.[3]  At approximately 1:50 p.m., Mendez spoke with an employee ("Employee-1") of the Kingsbridge Heights Community Center, the community center that had referred the children to the Daycare, and stated that everything was fine, but that Minor Victim-1 was breathing in a particular way.  Employee-1 asked Mendez to further describe the sound, but Mendez then responded, in sum, that everything was fine.  Approximately one hour later, Mendez found Minor Victim-1 and Minor Victim-2 unresponsive.  The defendant then placed a series of phone calls: first to Employee-1; then an approximately ten second call to Herrera Garcia; and then a call to 911.

Moments after the defendant called 911, but before emergency personnel arrived, Herrera Garcia rushed through the front door of the Daycare.  Approximately two minutes later, Herrera Garcia exited out the rear of the building, carrying two weighted bags.  Herrera Garcia then climbed through the bushes behind the Daycare, carrying those bags, and fled the scene.  All of this happened while Minor Victim-1 and Minor Victim-2 were lying unconscious on the floor.

---

[2] On June 10, 2023, Herrera Garcia pled guilty to all counts of the S1 Indictment; the Court sentenced him to 45 years' imprisonment.  On May 23, 2024, Parra Paredes pled guilty to a lesser included offense of Count One of the S1 Indictment; he is scheduled to be sentenced on October 31, 2024.

[3] Minor Victim-4's mother picked him up early at approximately 12:50 p.m.

A few minutes after Herrera Garcia fled the Daycare, Minor Victim-2's mother ("Mother-2") arrived on the scene. After peering through the windows of the Daycare, Mother-2 rushed inside to find the defendant holding Minor Victim-3, while Minor Victim-2 was lying unconscious on the floor, so much so that Mother-2 believed that her son was dead. Mother-2 cleared a path for emergency personnel and attempted to seek help from others outside the Daycare. Not finding any, she went back inside the Daycare, picked-up her lifeless son, and brought him outside where she attempted to revive him. Emergency medical personnel soon arrived at the scene. One EMT ("EMT-1") went inside the Daycare and found Minor Victim-1 lifeless with blue lips and no pulse or respiration while a second EMT ("EMT-2") assisted Mother-2. After briefly attempting CPR, EMT-1 carried Minor Victim-1 out of the Daycare and into a waiting ambulance.

At the hospital, after approximately 30 minutes of emergency medical treatment, Minor Victim-1 was pronounced dead. Minor Victim-2 presented in acute respiratory failure, but through emergency medical treatment was revived. Minor Victim-3, who was also brought to the hospital, was generally responsive, but displayed signs of opioid intoxication when failing to react properly to pain stimuli. During the course of their treatment, all three children (Minor Victims -1, -2, and -3) tested positive for fentanyl and were administered Narcan. Minor Victim-4, who had been picked-up from the Daycare earlier that day, was taken separately to the hospital by his parents when he appeared to be gravely ill shortly after pick-up. Minor Victim-4 also tested positive for opioids.

The medical examiner has determined the cause of death for Minor Victim-1 to be acute fentanyl intoxication.

### 2. The Children Ingested the Fentanyl

Following the autopsy of Minor Victim-1, the Office of the Chief Medical Examiner of New York City ("OCME") sent the child's gastric (stomach) contents to a laboratory for testing.

That testing revealed exceptionally high levels of fentanyl. By contrast, a significantly lower concentration of fentanyl was found in his blood. At trial, the Government expects to present expert testimony from Michael Smith, Ph.D., a forensic toxicologist and the current Science Director of the Quest Diagnostics laboratory in Chantilly, Virginia, concluding, to a degree of scientific certainty, that Minor Victim-1 ingested the fentanyl based on, among other things, the amount of fentanyl found the gastric contents of Minor Victim-1 and the high concentration of fentanyl Minor Victim-1's gastric contents compared to the much-lower concentration of fentanyl in Minor Victim-1's blood. The sequence of events on the day of the poisoning further confirms that ingestion was the source of the poisoning: all the children were poisoned simultaneously, just after the defendant had fed them lunch.

### 3. The Searches of the Daycare

Law enforcement conducted two searches of the Daycare. The first search, pursuant to a warrant, occurred the same night the children were taken to the hospital, and law enforcement found a one-kilogram brick of fentanyl, two "kilo press" machines and additional machine parts, and a hydraulic jack used in operating the kilo presses in two separate closets within the Daycare.[4] Law enforcement officers returned with another warrant on September 21, 2023. During the second search, law enforcement officers found two large traps—or concealed compartments—beneath the floor tiles of the playroom. Inside the traps were more than eleven kilograms of narcotics, including fentanyl, para-fluorofentanyl, and heroin, as well as stamps, glassines,[5] and other tools and instruments used to brand, package, distribute, and traffic narcotics.

---

[4] Kilo presses are used by narcotics traffickers to compress illegal narcotics into kilogram-sized bricks in preparation for distributing wholesale quantities of narcotics.

[5] A stamp is simply a logo narcotics traffickers put on their drugs in order to brand them for distribution.

### 4. CW-1 Testimony

At trial, the Government expects to call a cooperating witness ("CW-1")[6] who participated in the Daycare drug trafficking operation. CW-1 will testify, among other thing, that the defendant, Herrera Garcia, and Parra Paredes ran a large-scale drug packaging and distribution operation out of the Daycare. In particular, CW-1 is expected to testify that on multiple occasions in the spring and fall of 2023, CW-1 witnessed the defendant, Herrera Garcia, and Parra Paredes packing drugs in the Daycare in an assembly-line fashion. Parra Paredes combined different types of narcotics and inert substances together to prepare the drugs for distribution, Herrera Garcia placed measured amounts of the combined narcotics into baggies used for individual distribution, and Mendez stamped and then sealed the baggies. CW-1 saw the defendant, Herrera Garcia, and Parra Paredes become ill and vomit from packaging the drugs on multiple occasions. Notably, Herrera Garcia also once informed CW-1 that the defendant's and Herrera Garcia's own child—then a toddler— had become sick from the drugs after being in the Daycare. Herrera Garcia further advised CW-1 that he and the defendant were afraid to bring the child to the hospital because they feared the child would test positive for drugs, though they ultimately did so. Furthermore, CW-1 will testify that the defendant, Herrera Garcia, and Parra Paredes worked together with Herrera Garcia's brother, another co-conspirator, in drug trafficking before Herrera Garcia's brother died in October 2022. Herrera Garcia informed CW-1 that following the death of Herrera Garcia's brother, Herrera Garcia took possession of some of his brother's narcotics and narcotics packaging equipment and brought them to the Daycare space.

---

[6] The Government has referenced this witness as CW-1 in prior filings. *See, e.g.*, Dkt. No. 63.

### 5. The Death of the Defendant's Brother-In-Law

At trial, the Government expects to present limited evidence about the death of another co-conspirator, Herrera Garcia's brother—that is, the defendant's brother-in-law—CC-1, who died of acute fentanyl intoxication while packaging narcotics at an apartment in the Bronx on or about October 20, 2022, less than a year before the children were poisoned at the Daycare. When NYPD officers responded to the scene, the defendant, Herrera Garcia, and Parra Paredes were present. Crime scene photographs show that CC-1 was wearing latex gloves, consistent with someone who had been packaging drugs, and that there was white powder on his legs. In addition, glassines of narcotics—consistent with the design of the glassines found in the Daycare—as well as narcotics packaging equipment, were found near CC-1's body. Laboratory analysis revealed that the drugs found in CC-1's apartment contained the same noxious mixture of controlled substances as the drugs found in the Daycare—fentanyl, para-fluorofentanyl, and heroin.

### 6. The Defendant's Voluntary Interview with Law Enforcement and Subsequent Arrest

Following the poisoning of the children at the Daycare, the defendant voluntarily went to the local NYPD precinct to speak with law enforcement. During her interview, the defendant repeatedly lied about the events at the Daycare. For example, Mendez stated, among other things, that no one, aside from herself and her supervisor, entered the Daycare on September 15, 2023, even though video surveillance shows that Herrera Garcia was in and out of the Daycare twice that day—once around lunch time and once just before emergency personnel arrived; that she was unaware that drugs and drug paraphernalia were present in the Daycare, even though her text messages with co-conspirators prove her deep involvement in the drug operation; and that she suspected a gas leak in the apartment had caused the children to became sick. She also deleted

more than 20,000 WhatsApp messages she exchanged with Herrera Garcia between March of 2021 and the morning of September 15, 2023.

In the early morning hours of September 16, 2023, the defendant was arrested.

\* \* \*

The defendant has been charged in Superseding Indictment S4 23 Cr. 504 (JSR) with: (i) in Count One, conspiracy to distribute narcotics resulting in the death of Minor Victim-1 and serious bodily injury to Minor Victim-2, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A); (ii) in Count Two, possession with intent to distribute narcotics resulting in the death of Minor Victim-1, and aiding and abetting the same, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(A); and (iii) in Count Three, possession with intent to distribute narcotics resulting in serious bodily injury to Minor Victim-2, and aiding and abetting the same, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(A). (*See* Dkt. No. 115).

## ARGUMENT

### I. Surveillance Video Depicting the Minor Victims on September 15, 2023 Should be Admitted to Establish a Timeline of Events, Prove Minor Victim-2 Suffered Serious Bodily Injury, and Show the Defendant's Behavior in the Wake of the Poisonings

As described above, the Government expects to introduce surveillance video at trial, including video of Herrera Garcia entering and then fleeing the Daycare on September 15, 2023, and video of prior dates in September 2023 in which the defendant, Herrera Garcia, Parra Paredes, and others engaged in drug-related activity. Included among the videos the Government seeks to introduce are a handful of short video clips that show the Minor Victims. That video is as follows: (1) three clips, approximately two minutes each, of the four children arriving at the Daycare the morning they were later poisoned, September 15, 2023 (the "Dropoff Video"), (2) two approximately fifteen-second clips of Minor Victim-4 being picked-up from the Daycare by his

mother around 12:50 p.m. on September 15, 2023 (the "Pickup Videos"); and (3) approximately five minutes of video showing the sidewalk area outside of the Daycare in the immediate aftermath of the poisonings (the "Sidewalk Video").

The Dropoff Video shows each of the children being dropped off at the Daycare the morning of September 15, 2023. The children all appear healthy, and the timestamps on the footage establish the time of drop-off for each child. The Pickup Videos show Minor Victim-4 being picked-up from the Daycare by his mother. Minor Victim-4 appears very sleepy and can be seeing holding onto his mother and appearing to fall asleep on her shoulder. The Sidewalk Video begins a few minutes after Herrera Garcia fled out the back of the Daycare, and demonstrates that Minor Victim-2, for whom the Government has charged serious bodily injury, was limp and appeared lifeless when emergency help arrived at the Daycare after Herrera Garcia fled the scene. In particular, the Sidewalk Video shows Mother-2 rushing inside of the Daycare and exiting moments later with a limp Minor Victim-2 in her arms. Mother-2 can be seen on the video shaking Minor Victim-2 in an attempt to rouse him before handing him to EMT-2. The Sidewalk Video also shows EMT-1 carrying Minor Victim-1, who also appears to be either sleeping or lifeless, from the Daycare. The Dropoff, Pickup, and Sidewalk Videos are attached hereto as Exhibits A, B, and C, respectively (GX 915A, 915B, 915C, 915H, 915I, 915J, 915J).

The Dropoff, Pickup, and Sidewalk Videos should be admitted because they (1) establish a timeline of events relevant to how the children were poisoned, and (2) establish the serious bodily injury suffered by Minor Victim-2, which is an element of Counts One and Three of the S4 Indictment, and (3) show Mendez's actions and behavior in the wake of the poisonings.

**A. Applicable Law**

Under Rule 402 of the Federal Rules of Evidence, "relevant evidence is admissible" at trial unless its admission is otherwise prohibited. Fed. R. Evid. 402. "[R]elevant evidence" is evidence

having "any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action." Fed. R. Evid. 401. Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997). Rather, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.* Rule 403 authorizes the exclusion of relevant evidence only if its "probative value is substantially outweighed by [the] danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that is not the same as being "unfairly" prejudicial under Rule 403. *See Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000). As the Second Circuit has stated, "all evidence incriminating a defendant is, in one sense of the term, 'prejudicial' to him: that is, it does harm to him" and in "that sense, the more pertinent evidence is, the more prejudicial it is," but "[w]hat 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'" *United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986) (emphasis in original). Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Evidence that is neither "more sensational" nor more "disturbing" than the charged crimes will not be deemed unfairly prejudicial. *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

**B. Discussion**

The Dropoff, Pickup, and Sidewalk Videos should be admitted at trial. The Dropoff Video is relevant because it shows that the children appeared healthy when they arrived at the Daycare

on September 15, 2023. Additionally, through testimony and both the Dropoff and Pickup Videos, the Government intends to establish that the children were poisoned while at the Daycare the morning of September 15, 2023. The children were healthy when they were dropped-off, but by the time Minor Victim-4 was picked-up on the Pickup Footage, they were ill.

The Sidewalk Video should also be admitted. First, the Sidewalk Video is unquestionably relevant. Because the footage clearly depicts Minor Victim-2's injuries at as close a time as possible to when the injuries were discovered, it is highly probative of the nature and extent of the harm suffered by Minor Victim-2, which is an element of Counts One and Three of the S4 Indictment. Indeed, it is particularly probative because, as an emergency room physician for Minor Victim-2 is expected to testify, Minor Victim-2 was quickly revived once he was given Narcan in the emergency room. Thus, the video footage makes clear that although Minor Victim-2 was revived upon receiving medical treatment, before being administered Narcan, his condition was extremely serious. In short, the Sidewalk Video is highly relevant and incontrovertible evidence of the extent of the injuries suffered by Minor Victim-2.

Moreover, the Sidewalk Video depicts the defendant's response to the poisonings, which is probative of her knowledge of and involvement in the conspiracy. On the video footage, it is clear that Mendez never leaves the Daycare until after emergency personnel arrive, after which time she can be seen walking on the sidewalk with Minor Victim-3, the youngest child, on her hip. This behavior is directly contrary to what the defendant stated she did during her police interview on September 15, 2023, when she told officers that she "went crazy and started calling and yelling and asking everyone to come in, to come in and help me. They can . . . they can . . . everybody

11

can tell you that I went out like crazy yelling . . . and to call everybody . . . asking to help me . . ."[7] The individual who frantically tried to help the children, opened all the doors, and went onto the street screaming for help was Mother-2, not the defendant.  There was no camera inside the Daycare on September 15, 2023, so what exactly the defendant did after calling her husband and then 911 is not entirely clear, but what she *did not* do was what every innocent actor would do—try to find as much help as possible as quickly as possible.

The Sidewalk Video is not unfairly prejudicial under Rule 403.  Although the footage—depicting the near-death experience of a minor child—is upsetting, it is not particularly gruesome. *See e.g.*, *United Stats v. Salameh,* 152 F.3d 88, 122-23 (2d Cir. 1998) (affirming the admission of photographs of victims killed in the World Trade Center bombing, including an obviously pregnant woman, and explaining that "[p]robative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact"); *United States v. Kuo Chen*, No. 10-CR-671 (S-1) (KAM), 2011 WL 197585, at *2 (E.D.N.Y. Jan. 11, 2011)  (photographs of the injured victim were not "so gruesome or shocking as to warrant exclusion" of highly relevant evidence).  The Sidewalk Video is not intended to inflame or prejudice the jury, but rather to set forth the timeline of events of September 15, 2023, serve as the best evidence of the injuries suffered by Minor Vicitm-2, and show the defendant's behavior in the wake of the poisonings.  Furthermore, the defendant is charged with operating a narcotics operation out of a Daycare that resulted in the death of Minor Victim-1 and serious bodily injury to Minor Victim-2.  The evidence presented in the form of the Sidewalk Video is not "more sensational" or more "disturbing" than the crimes charged: it is core

---

[7] Mendez's interview at the police precinct took place in Spanish; the above quotations are from a certified translation.

to the charged conduct and relevant to elements of the offenses—the serious bodily injury and death suffered by the victims. *See Roldan-Zapata*, 916 F.2d at 804.

Accordingly, the Court should allow the Dropoff, Pickup, and Sidewalk Videos to be admitted into evidence.

## II. Limited Evidence Concerning the October 20, 2022 Death of the Defendant's Brother-in-Law, CC-1, Should Be Admitted to Prove the Extended Duration of the Conspiracy and the Defendant's Involvement in that Entire Duration.

As set forth above, the Government seeks to present limited evidence at trial regarding the death of the defendant's brother-in-law, CC-1, on or about October 20, 2022, at an apartment in the Bronx. The evidence the Government seeks to admit includes: (i) the testimony of one NYPD officer who responded to the scene of CC-1's death, who will authenticate photographs taken by law enforcement of the apartment in which CC-1's body was found and screenshots and video of body camera footage depicting the defendant, Herrera Garcia, and Parra Paredes present at the scene where CC-1's body was found; and (ii) the results of the laboratory testing conducted on the controlled substances found at the scene of CC-1's death. The Government does not seek to introduce any autopsy photos or photos of CC-1's body at the scene or testimony of any other law enforcement witnesses beyond the testimony of one responding officer. The evidence the Government seeks to introduce is narrowly tailored and constitutes direct evidence of the conspiracy, which the Government contends, and the S4 Indictment alleges, existed before CC-1's death.

As explained above, CW-1 is expected to testify that in early 2023, Herrera Garcia explained to CW-1 that CC-1 had been packaging narcotics when he died, that the defendant, Herrera Garcia, and Parra Paredes worked with him in trafficking narcotics, and that following CC-1's death Herrera Garcia took possession of some of the drugs and equipment used to package narcotics at CC-1's apartment and brought them to the Daycare. Additionally, the physical

evidence at the scene of CC-1's death strongly suggests a connection between the narcotics operation found in that apartment and the narcotics operation at the Daycare.  In particular, the packaging of the drugs found at the scene of CC-1's death is consistent with the packaging materials found at the Daycare.  More specifically, both the drugs packaged at CC-1's apartment and the Daycare were packaged in small glassines marked with a red stamp.  Furthermore, the chemical analysis of the drugs at CC-1's apartment shows that the drugs present contained the same lethal mix of para-fluorofentanyl, fentanyl, and heroin that was found at the Daycare. Accordingly, the evidence the Government seeks to present from the scene of CC-1's death is simply direct evidence of the conspiracy—a conspiracy that spanned multiple years and multiple locations.  To the extent CW-1 learned information regarding CC-1's poisoning from Herrera Garcia, the evidence is also plainly admissible as co-conspirator statements in furtherance of the conspiracy under Rule 801(d)(2)(E).

### III.   Certain Text and Voice Messages are Admissible as Statements of a Party Opponent or Co-Conspirator Statements in Furtherance of the Conspiracy.

At trial, the Government expects to present text and voice messages exchanged among the members of the Daycare drug trafficking conspiracy in furtherance of the conspiracy. These statements are admissible as co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E), and to the extent they include the words of the defendant, are admissible as statements of a party opponent pursuant to Fed. R. Evid. 801(d)(2)(A).

#### A.    Applicable Law

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if … the statement is offered against an opposing party and … was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that

included the defendant and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181).

To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they, among other things: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities,

*United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).  A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy."  *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994); *see also Desena*, 260 F.3d at 159; *Maldonado-Rivera*, 922 F.2d at 958; *United States v. Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002).[8]

### B.  Discussion

The text and voice messages the Government seeks to admit fall into two general categories: (1) statements about the logistics and operation of the narcotics conspiracy, and (2) statements about illnesses associated with the drug trafficking conspiracy.  To the extent the statements are hearsay, they are admissible pursuant to Fed. R. Evid. 801(d)(2)(E) and Fed. R. Evid. 801(d)(2)(A) as statements of a party opponent and/or co-conspirator statements in furtherance of the conspiracy.

### 1.  Statements about Logistics and Operation of the Narcotics Conspiracy

The Government seeks to offer text message and voice message communications, some of which were written or spoken by the defendant, about the logistics and operations of the Daycare drug conspiracy.

---

[8] Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group."  *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted).  For example, in *United States v. Lozano-Reyes*, the Second Circuit affirmed the trial court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits."  101 F.3d 686, at *2 (2d Cir. 1996).

Such messages include, for example, exchanges between the defendant and Herrera Garcia in which they discuss white or small bags (consistent with the color and size of the glassines found in the traps in the Daycare) and cash.[9]  A sampling of such messages is below.

| | |
|---|---|
| Defendant: | Love |
| Defendant: | This is supposed to be more |
| Defendant: | Money |
| Defendant: | Because they're 20's and 10's |
| [Herrera Garcia]: | Right |
| [Herrera Garcia]: | That's true |
| [Herrera Garcia]: | When the white bags |
| [Herrera Garcia]: | The packages |
| [Herrera Garcia]: | There has to be 23 of the white ones |
| Defendant: | Figure out your thing correctly |
| [Herrera Garcia]: | Count the packages of 10 that are there |
| Defendant: | They say it's more money |

(July 5, 2022).

| | |
|---|---|
| Defendant: | How much is it |
| Defendant: | In total |
| [Herrera Garcia]: | 1400 |
| Defendant: | For this |
| [Herrera Garcia]: | You told me 700 and 700 |
| [Herrera Garcia]: | 700 in 20's |
| [Herrera Garcia]: | And 700 in 10's |
| Defendant: | OK |

(July 12, 2022).

| | |
|---|---|
| [Herrera Garcia]: | Good morning, love |
| [Herrera Garcia]: | Listen bring me the package of small bags |
| [Herrera Garcia]: | That's in my t-shirt |
| Defendant: | OK |

(September 2, 2022).

---

[9] All of the quoted messages the Government seeks to admit were originally in Spanish; the text here is a translation from a certified court interpreter.

Other sets of text messages involve communications between the defendant and co-conspirator Parra Paredes about, for example, issues the conspiracy is having with customers. For example, on December 16, 2022, the following exchange took place between the defendant and Para Paredes, in response to another co-conspirator ("CC-2") telling the defendant he might take his business elsewhere:

| | |
|---|---|
| Defendant: | Are you already awake? |
| Parra Paredes: | Yes. |
| Parra Paredes: | Why? |
| Defendant: | To see if you can give some advice |
| Defendant: | To that compadre of yours |
| Parra Paredes: | About what? |
| Defendant: | Because [CC-2] is giving him 5 "pesos" but he's super mad, and he shouldn't act that way towards [CC-2] |
| Defendant: | Otherwise he'll take away our work from us |
| Parra Paredes (v):[10] | I…I told him, I told him to take that and forget about life. When he gives the guy the other ones, I'll pay him. I'm going to bring the money to [CC-3], and I think I'll go to his place so I can bring it to him. I'm going to [CC-3's] place now to bring him the five hundred, and when I come back from there, if he wants, I'll go by, to pick it up. I'm going to tell him now. |
| Defendant: | But he won't do that to Oju |
| Defendant: | Of course. |
| Parra Paredes: | You know it, with the ones that we have to be... we don't…we don't…we don't…with the ones who are who are good, we'll go easy on them. |
| Defendant: | Of course, [Parra Paredes], because he's just putting on an act and stuff. I said to him, "Love..." I was just writing to him, and I even stopped writing to him. I said to him, "Stop it and take that" because [CC-2] said to me, "No way, man, no way, if this keeps going on like this, I think I'm going to buy all my stuff and I'm going to do it myself" and so on and so forth. And I told him, "No, man, no, don't worry, you do this is slowly, let them take that. And go slowly" and so on. You know, because... you tell me, Jean Carlo has more, and he's not charging them. He's now obsessed with him, with... with [CC-2], [U/I] he takes away from us the work. I'm |

---

[10] The voice recordings in the exchange are marked with a "(v)".

> telling you, sometimes I just want to take [Herrera Garcia] and slam him against the wall.

The "compadre" the defendant is referencing is Herrera Garcia. Thus, the defendant is reaching-out to Parra Paredes to ask Parra Paredes to talk some sense into Herrera Garcia because a dispute Herrera Garcia is having with CC-2 could result in CC-2 taking "work"—that is, drug packaging work—away from the defendant, Mendez, and Herrera Garcia. To the extent these statements are hearsay, Mendez's statement are admissible as the statements of a party opponent and Parra Paredes's are admissible both to give context to Mendez's statements and as co-conspirator statements in furtherance of the conspiracy.

### 2. Statements about Illnesses Associated with the Drug Trafficking Operation

The Government expects to offer into evidence audio and translations of a series of recorded voice messages exchanged between the defendant and another co-conspirator, Jean Carlo Amparo Herrera ("Amparo Herrera"), in which the defendant tells Amparo Herrera that defendant's and Herrera Garcia's son became sick after being "down there"—that is, in the Daycare space. CW-1's testimony will make clear that the defendant and Herrera Garcia suspected that this illness had been brought on by the drugs in the Daycare and were, as a result, afraid to bring their child to the hospital. In the messages, the defendant, among other things, states: (i) that her son ate something "down there"; (ii) that what he ate "down there" made him sick; (iii) that her son was "down there" for "a while" the previous night; (iv) that her son was vomiting; and (v) that she and Herrera Garcia took their son to the hospital. This exchange is relevant and admissible either as statements of a party opponent for statements of the defendant and for Amparo Herrera's statements, to give context to the defendant's statements and/or as co-conspirator statements in furtherance of the conspiracy.

The Government will similarly elicit testimony from CW-1 regarding a conversation between CW-1 and Herrera Garcia in which Herrera Garcia told CW-1 that his and the defendant's minor child became sick while in the Daycare space and Herrera Garcia and Mendez were afraid to bring the child to the hospital because they were concerned he would test positive for drugs, though they ultimately did so.  This testimony is similarly admissible as co-conspirator statements.  At the time Herrera Garcia made the statements, CW-1 and Herrera Garcia were in the Daycare drug conspiracy together, and in making these statements Herrera Garcia was informing CW-1 about the need to keep they Daycare space very clean, because leaving drugs around could pose a danger to the conspiracy by sickening others—in this case, Herrera Garcia and the defendant's minor son.

Along the same lines, the Government seeks to admit into evidence messages exchanged between the defendant and Parra Paredes in which the defendant informs Parra Paredes about being sick after being in the Daycare.  In particular, in January 2023, the defendant sent Parra Paredes a voice recording in which she stated as follows:

> Ñemo, leave me the thing up there on the little table in . . . in the living room, because . . . I forgot to take what you were going to give me because you know, I was sick when I went upstairs and I threw up right there next to the . . . the . . . the steps, next to the first ones. I left that gift there for . . . .[Laughs], to the super. I even felt embarrassed.

CW-1 will testify that on numerous occasions he observed the defendant and her co-conspirators become sick while packaging narcotics in the Daycare.  This voice note in which the defendant states that she was sick when she went "upstairs"—that is, to her apartment that was located upstairs from the Daycare—is, therefore, evidence of Mendez's participation in the drug packaging operation.  It is, therefore, relevant, and as a statement made by Mendez, it is admissible as the statement of a party opponent.

Accordingly, the Government respectfully requests that statements like the examples set forth above by co-conspirators in furtherance of the narcotics conspiracy as well as statements made by the defendant herself, be admitted a trial.

## IV.  The Court Should Admit a Voice Message in Which the Defendant States that Running a Daycare is Not Her "Thing"

On  July 18, 2023, the defendant sent a voicemail to another individual ("Individual-1") in which she stated, among other things, that:

> This is not my type of business, [Individual-1]. My kind of business is where I see people, where I interact with people and all that. But kids, no way. I have now realized, that kids are not my thing.

The "[t]his" that is not the defendant's "type of business," is the Daycare.  The defendant made this statement and reached this conclusion less than *three weeks* after the Daycare opened.  The fact that the defendant is making such statements suggests it was not, for example, her life's dream to open a Daycare, and that rather the Daycare was opened as a front to cover for the drug operation happening inside.  Additional support for this position is found in the application the defendant submitted to the New York Department of Health and Mental Hygiene to obtain a license to open the Daycare, in which co-conspirator Parra Paredes served as one of the defendant's references, and Herrera Garcia served as a reference for an individual who was purportedly going to serve as Mendez's assistant.  Accordingly, this voice recording is relevant because it goes to whether the Daycare itself was operated as a cover for the narcotics operation and it is admissible as the statement of a party opponent.  *See* Fed. R. Evid. 801(d)(2)(A).

## V.  The Court Should Preclude Evidence and Argument Concerning the Potential Punishment or Consequences of Conviction

The defendant should be precluded from offering evidence or argument concerning the potential punishment or consequences that she faces if convicted.  Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to

what sentence might be imposed.'" *Shannon v. United States,* 512 U.S. 573, 579 (1994) (quoting

*Rogers v. United States*, 422 U.S. 35, 40 (1975)).  This is for good reason: argument concerning

punishment "invites [jurors] to ponder matters that are not within their province, distracts them

from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*  There is

no proper basis for the defendant to put these issues before the jury in any form, and the defendant

should not be permitted to offer evidence or argument inviting the jury to consider them.  *See, e.g.*,

*United States v. Avenatti*, No. 19 Cr. 374 (JMF), Dkt. No. 288 (S.D.N.Y. Jan. 13, 2022) (Tr. 9-10)

("anything that adverts to possible punishments, including possibility of incarceration, however

obliquely, is improper and will not be permitted," including, for example, a statement in opening

statements or closing arguments that the defendant's "liberty is at stake," which would be "a not-

so-thinly veiled reference to the prospect of incarceration, which is altogether improper.").

## VI.  The Court Should Preclude Evidence of Good Acts

The defendant may seek to argue that she has engaged in good acts or other non-criminal

activity.  Any such argument should be precluded, and the defendant should not be permitted to

introduce evidence related to such an argument, cross-examine witnesses about such an argument,

or make statements to the jury about such an argument.

### A.    Applicable Law

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed.

R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative

value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90

(2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

### B.    Discussion

To the extent that the defendant seeks to present evidence or argument concerning her prior commission of "good acts" or to offer evidence of her non-criminal activities to disprove her guilt of the crimes charged, the Court should preclude her from doing so. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.  *See United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) ("A defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions") (internal punctuation omitted); *United States v. Bankman-Fried,* 22 Cr. 673 (LAK), 2023 WL 6283509, at *4 (S.D.N.Y. Sept. 26, 2023) ("the defendant is precluded from referring to any alleged prior good acts by the defendant, including any charity or philanthropy, as indicative of his character or his guilt or innocence").







## **CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
October 24, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    s/_____
Maggie Lynaugh
Brandon C. Thompson
Alexandra Rothman
Assistant United States Attorneys
(212) 637-2448 / 2444 / 2580

Karl Miller
Special Assistant United States Attorney
(212) 637-2225