

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javitz Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 24, 2025

**VIA ECF & EMAIL**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: <u>United States v. Grei Mendez</u>,  S4 23 Cr. 504 (JSR)

Dear Judge Rakoff:

  The defendant in the above-captioned case (the "defendant" or "Mendez") is scheduled to be sentenced on March 3, 2025, at 2:00 p.m., for establishing and operating a daycare facility in the Bronx used to traffic fentanyl.  On September 15, 2023, the conduct of the defendant and her co-conspirators killed a 22-month-old baby, caused serious bodily injury to a 25-month-old baby, and poisoned two additional babies, ages eight months and 25 months.  All of the babies were poisoned by fentanyl while under the defendant's care.

  The Government respectfully submits this letter in connection with the defendant's sentencing.  The applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G") range is life imprisonment with a mandatory minimum sentence of 20 years.  Probation has recommended that a sentence of 50 years be imposed.  The Court has sentenced the defendant's husband and co-conspirator—Felix Herrera Garcia ("Herrera Garcia")—to 45 years' imprisonment; co-conspirator Renny Antonio Parra Paredes ("Parra Paredes") to 30 years' imprisonment; and co-conspirator Jean Carlo Amparo Herrera to 10 years' imprisonment.  It is the Government's view that Mendez is deserving of life imprisonment, but at the very least a sentence at least as severe as Herrera Garcia.  Not only was Mendez deeply involved in drug trafficking, she is the individual who bears primary responsibility for involving babies in the conspiracy's activities.  Simply put, without Mendez this would have been just another drug conspiracy moving large quantities of illegal narcotics.  But with Mendez, this was a conspiracy so dangerous that it would almost inevitably result in a loss of life.  Additionally, Mendez bears added responsibility for her conduct on September 15, 2023, when she took no action to provide or call upon what could have been life-saving medical intervention to the babies despite clear warning signs that they were becoming seriously ill.  And after tragedy struck, she lied to law enforcement and destroyed evidence in an effort to protect herself and her co-conspirators from their culpability in the death of one baby and poisoning of three others.

In sum, it is the Government's position that Mendez is the individual most responsible for the profound and irreparable harm that befell the children, their families, and the community on September 15, 2023. She should be sentenced accordingly.

## I.   Offense Conduct

### A. The Events of September 15, 2023 at Divino Niño Daycare

On Friday, September 15, 2023, between approximately 8:25 a.m. and 8:45 a.m., four healthy babies—MV-1, MV-2, MV-3, and MV-4[1]—ranging in age from eight months to 25 months, were dropped off at Divino Niño Daycare (the "Daycare") in the Bronx by their parents. (PSR ¶ 17). It was the last day of MV-1's and MV-4's first full week at the Daycare, and MV-1's second full day in attendance. After engaging in morning activities, Mendez fed the children lunch. Three of the children—MV-1, MV-2, and MV-3—were then put down for a nap. The fourth child, MV-4, was picked-up early by his mother at approximately 12:50 p.m. (PSR ¶¶ 17-18).

One hour later, at approximately 1:43 p.m., Mendez noticed something odd about MV-1. She called an employee of the community center in the Bronx ("Center Employee-1") that oversaw the Daycare and left her a message. (PSR ¶ 19). A few minutes later, they spoke on the phone. During that call, Mendez informed Center Employee-1 that there was an issue with MV-1's breathing—it was making a certain noise. (PSR ¶ 19). When Center Employee-1 asked Mendez to further describe the sound, Mendez went to check on MV-1; she then informed Center Employee-1 that everything was fine and that MV-1's mother was texting. Records from Mendez's phone show that MV-1's mother had messaged Mendez several minutes earlier, at approximately 1:46 p.m., that she was going to pick MV-1 up around 3:00 p.m. Mendez never raised the issue of MV-1's breathing with his mother. (PSR ¶ 19).

One hour later, at approximately 2:40 p.m., Mendez placed a series of phone calls. First, Mendez called another employee of the community center ("Center Employee-2") and reported that several of the children in her care were not responsive. (PSR ¶ 20). She then called her husband, Herrera Garcia. After speaking with Herrera Garcia for approximately ten seconds, she hung-up with him and called 911. (PSR ¶ 20).

In the moments following Mendez's call to Herrera Garcia, Herrera Garcia rushed through the front door of the Daycare. Approximately two minutes later, Herrera Garcia exited the Daycare and ran out the back of the building. (PSR ¶ 21). Although Herrera Garcia was empty-handed when he entered the Daycare, he left carrying two weighted bags. Those bags in hand, Herrera Garcia climbed through the bushes behind the Daycare and fled the scene, all before the arrival of emergency personnel. (PSR ¶ 21).

While Herrera Garcia was fleeing, Mendez remained inside the Daycare. The next person to arrive at the scene was MV-2 and MV-3's mother. She rushed inside and found Mendez holding MV-3 while MV-2 was unconscious on the floor. (PSR ¶ 22). After clearing a path by moving a

---

[1] In prior filings and the PSR, MV-1 is Minor Victim-1, MV-2 is Minor Victim-2, MV-3 is Minor Victim-3, and MV-4 is Minor Victim-4.

stroller and holding open the entrance to the Daycare in anticipation of emergency personnel, MV-2 and MV-3's mother ran back inside the Daycare, picked-up her unresponsive son, and carried him outside to the street where she desperately attempted to revive him. (PSR ¶ 22). Soon thereafter, emergency medical personnel arrived at the scene. One of the emergency medical technicians immediately began providing medical care to MV-2, and soon thereafter transported him to the hospital. Another emergency medical technician hurried inside the Daycare, escorted by Mendez, who had emerged from the Daycare to meet the ambulance. There he found MV-1, lifeless on the floor with blue lips, no pulse, and no respiration. (PSR ¶ 22). He quickly picked MV-1 up and carried him to an ambulance to be rushed to the hospital. (PSR ¶ 22). At no point did Mendez indicate to emergency personnel that the children could be suffering from opioid poisoning or suggest administering Narcan, a drug used to reverse opioid overdoses. (PSR ¶ 22). Nor did Mendez herself administer Narcan, despite the fact that there was a canister of the life-saving drug in the medicine cabinet of the Daycare. (PSR ¶22). Video footage of the outside of the Daycare depicting the above-described events is attached hereto as Exhibit A.[2]

Upon their arrival at the hospital, the prognosis for both MV-2 and MV-1 was dire. MV-2 arrived in acute respiratory failure, meaning that he had limited-to-no breathing. (PSR ¶ 24). Through the administration of Narcan, however, physicians were able to revive him. Even one dose of Narcan, though, was not sufficient; physicians ultimately had to put him on an intravenous Narcan drip to keep him from drifting back into an overdose. (PSR ¶ 24).

MV-1's situation was even more tragic. For approximately 30 minutes after arriving at the emergency room, a team of doctors worked frantically to revive him. Despite intensive intervention, nothing could bring him back. MV-1 never regained a pulse. The emergency room physician who treated MV-1 and then informed MV-1's parents of his death has described that experience as one of the worst days of her life. (PSR ¶ 23).

MV-3 was also brought to the hospital and treated. Though she was conscious, she failed to respond properly to pain stimuli. (PSR ¶ 24). She similarly received Narcan and improved. MV-4, who had been picked up from the Daycare earlier in the day, was taken to a different hospital by his parents after he showed signs of illness. (PSR ¶ 24). He was also determined to be suffering from opioid exposure.

Toxicology tests performed on all four children who had been present at the Daycare— MV-1, MV-2, MV-3, and MV-4—revealed the presence of fentanyl. (PSR ¶ 24). MV-1's cause of death was determined to be acute fentanyl intoxication. (PSR ¶ 25). Testing of the contents of MV-1's stomach revealed a high concentration of fentanyl. (PSR ¶ 25).

### B. The Searches of the Daycare

In the hours following the poisoning of the children, law enforcement personnel conducted a search of the Daycare, which was operated out of a one-bedroom apartment in the basement of a residential building in the Bronx. (PSR ¶ 27). During the course of that search, law enforcement

---

[2] Exhibit A shows the entrance to the Daycare from two angles—the sidewalk outside the entrance to the Daycare the vestibule right in front of the Daycare entrance. Because Exhibit A depicts minor victims, the Government respectfully requests that the footage be filed under seal.

officers found a kilogram-sized brick of fentanyl and two "kilo press" machines used to compress powdered narcotics into brick form in a closet within the Daycare. (PSR ¶ 27). The brick and one of the kilo presses is pictured below.




Approximately six days later, on September 21, 2023, law enforcement officers searched the Daycare a second time. (PSR ¶ 28). This time, they found much more. Hidden under the floor tiles in the playroom of the Daycare, beneath the playmats and the cribs, were two "traps"—hidden compartments used to conceal narcotics. (PSR ¶ 28). Pictured below is one of the traps found underneath a playmat. The photograph on the left depicts the position of the playmat in the playroom; the photograph on the right reveals the trap underneath the playmat. The plunger that is visible in the photograph on the right was used to lift the floor tiles and expose the trap.




Inside the traps, law enforcement officers found over eleven kilograms of narcotics as well as stamps, glassines, and other paraphernalia used in packaging, distributing, and trafficking narcotics. (PSR ¶ 28). All of the packages of narcotics found in the traps contained fentanyl or one of its analogues; most also contained heroin. (PSR ¶ 59-60). One of the fully exposed traps is pictured below.



### C. Mendez's Interview

After the babies were rushed to the hospital on September 15, 2023, Mendez was interviewed at the 52nd precinct by law enforcement officers. During those interviews, Mendez repeatedly lied, denying that others (such as Herrera Garcia) had been inside the Daycare that day and denying any knowledge of drugs. (PSR ¶ 50). When asked what she thought happened to the babies, Mendez responded that she didn't know and hypothesized that there may have been a gas or carbon monoxide leak. (PSR ¶ 50). Mendez made those statements knowing full well that that the babies entrusted to her care were sleeping, playing, and eating on top of more than eleven kilograms of fentanyl. At the same time, Mendez acknowledged that she was fully aware of the grave danger posed by fentanyl, stating, for example:[3]

| | |
|---|---|
| Agent 1: | You don't . . . you have no idea how the drugs got into the apartment? |
| Mendez: | No, and I . . . and do you think I'm going to let them keep that on top . . . in there, owing so much in rent and owning a daycare? |
| Mendez: | Do you think I don't know the danger there? |
| Mendez: | I . . . my son spends time there . . . |
| Mendez: | . . . as well. I'm not going to allow them to do that. |
| Mendez: | I wouldn't be there if I knew. **I know how dangerous that is**. |
| Mendez: | I'm not going to be there if I know there's bad things in there. |

\* \* \*

| | |
|---|---|
| Agent 1: | It's very hard to believe that it's your daycare, where we find drugs and that you don't know anything about it. |

---

[3] Mendez spoke only Spanish during her interviews; the quoted statements are from certified translations of video recordings of those interviews.

| | | |
|---|---|---|
| Agent 1: | | It's very difficult to believe . . . |
| Agent 1: | | As the . . . as his partner said, you . . . you have to know who . . . who put that there or you are protecting someone. . . You . . . you have to . . . you have to give us a clue to help yourself. |
| Mendez: | | I just don't know, really, from the bottom of my heart, I just don't know. |
| Mendez: | | If that had been there, I wouldn't let them put it there. |
| Mendez: | | If I had known . . . |
| Agent 1: | | Are the drugs yours? |
| Mendez: | | . . . I wouldn't have let anyone . . . Huh? |
| Agent 1: | | Are the drugs yours? |
| Mendez: | | No! |
| Agent 1: | | Are they Felix's? |
| Mendez: | | No! |
| Agent 2: | | Carlisto's? |
| Agent 1: | | Carlisto's? |
| Mendez: | | No, I don't know. |
| Agent 1: | | *So*, it just got there? |
| Mendez: | | I don't know. I'm never going to let them put . . . put things that could cause problems for me. |
| Mendez: | | And I know that . . **. because I'm not stupid, I watch the news; I know that stuff kills.** |

(PSR ¶ 50). Additionally, while at the 52nd precinct, Mendez deleted tens of thousands of text and voice messages from her phone.[4] (PSR ¶ 51).

### D. The Defendant's Role

Mendez played a central role in the narcotics trafficking conspiracy run out of the Daycare, establishing and operating the Daycare as cover and then packaging the drugs and participating in business operations.

#### 1. Mendez Established and Operated the Cover Operation—the Daycare

In December 2022, Mendez submitted an application to the New York City Department of Health and Mental Hygiene to open the Daycare.[5] On that application, Mendez listed Parra Paredes as a reference as well as two other individuals. Based on the content of Mendez's text messages, at least one of those other individuals ("Reference-1") also appears to have been involved in drugs with Mendez and Parra Paredes. (PSR ¶ 32, 45). Parra Paredes's reference, submitted in April 2023, stated that he had known Mendez for 14 years, that they were friends, that she "is very good with children" and rated her ability to provide a safe and loving environment as "excellent." Reference-1 similarly rated Mendez's ability to provide a safe and loving environment as "excellent," and stated that Mendez is a "lovely caregiver." (PSR ¶ 32). Mendez used these references, signed by her co-conspirators, fully aware that the space in which her

---

[4] Many of the deleted messages were able to be recovered; it is unclear if all were. (PSR ¶ 51).
[5] Herrera Garcia began leasing the Daycare space at least as early as June 2022.

Daycare would be located—that is, the space into which she would be bringing other people's *babies*—was a drug den for which the children would provide cover.

Once the Daycare opened in June 2023, Mendez obtained enrollees by partnering with a local community center that provided subsidized childcare to its members. The community center assigned three families to the Daycare. At the Daycare, Mendez had sole responsibility for taking care of the babies. She supervised playtime, fed the babies their meals, and was in charge of their safety. She did this all while kilos upon kilos of drugs were being concealed in the place law enforcement officers or thieves were least likely to look—underneath the cribs and playmats.

### 2. Mendez Packaged the Drugs

Mendez, Herrera Garcia, and Parra Paredes packaged narcotics stored in the Daycare for further distribution on a regular basis. Sometimes they pressed powdered narcotics into kilogram-sized bricks using a kilo presses. Other times they packaged small amounts of narcotics into glassines to be sold for individual use. Packing their drugs into glassines was a multi-step process that involved mixing different types of drugs and inert substances, weighing the drugs, and ultimately placing the final product into stamped glassines. (PSR ¶ 34). Mendez's primary responsibility in the packaging process was stamping the glassines with a logo, sealing them after they had been filed with drugs, and then stacking them into boxes. (PSR ¶ 34-35).

During the course of their mixing and packaging activities, Mendez, Herrera Garcia, and Parra Paredes used kitchen utensils such as bowls, pans, and sponges—some of the very same utensils that were then used to prepare food for the children. (PSR ¶ 38). Two nights before the children became sick at the Daycare, Herrera Garcia and Parra Paredes were in the Daycare packaging narcotics for approximately six hours, beginning just after the babies had been picked-up by their mothers. (PSR ¶ 33). Mendez was also in the Daycare for brief periods during that six-hour timeframe. (PSR ¶ 33 & n.4).

### 3. Mendez's Text Messages Confirm Her Deep Involvement in the Conspiracy

Text messages found on Mendez's phone confirm her deep involvement in the narcotics-related aspects of the conspiracy. For example, on June 27, 2022, Mendez and Herrera Garcia had the following text exchange about packaging narcotics:

| | |
|---|---|
| Mendez: | I already |
| Mendez: | Did/made them. |
| Herrera Garcia: | Good heavens! |
| Herrera Garcia: | You don't waste any time.[6] |

(PSR ¶ 44). Similarly, on July 5, 2022, Mendez and Herrera Garcia exchanged messages about drug payment and quantities:

| | |
|---|---|
| Mendez: | This is supposed to be more |

---

[6] All text and voice notes described in this submission were originally in Spanish. All quotations are from certified translations.

| | |
|---|---|
| Mendez: | Money |
| Mendez: | Because they're 20's and 10's |
| Herrera Garcia: | Right |
| Herrera Garcia: | That's true |
| Herrera Garcia: | When the white bags |
| Herrera Garcia: | The packages |
| Herrera Garcia: | There has to be 23 of the white ones |
| Mendez: | Figure out your thing correctly |
| Herrera Garcia: | Count the packages of 10 that are there |
| Mendez: | They say it's more money |
| Herrera Garcia: | So let me know |
| Herrera Garcia: | Yes |
| Mendez: | How much do you have to get? |
| Mendez: | They're asking |
| Herrera Garcia: | Tell me how many packs of 10 there are at first |
| Mendez: | There are 40 of 100 |
| Mendez: | One |
| Herrera Garcia: | The red ones |
| Herrera Garcia: | There are, there are 40 |
| Herrera Garcia: | I'm sure about that |
| Herrera Garcia: | What I want to know is how many packs of the white ones there are there |
| Mendez: | You're calculating the 20's the same as the 10's |
| Herrera Garcia: | Love, just tell me how many packs of 10 there are |
| Herrera Garcia: | Are there 13 of them? |
| Herrera Garcia: | Or 23? |
| Herrera Garcia: | If it's more money, tell me when you count it |
| Mendez: | One has 7 and the other one has 6 |
| Herrera Garcia: | OK, I'll tell you now |
| Mendez: | Where is [CC-1]? |
| Mendez: | Is he over there? |
| Mendez: | I told [CC-1] that I'm arriving at 10:30 |
| Herrera Garcia: | Arriving |
| Herrera Garcia: | Love, tell him/her that it's just like that |
| Herrera Garcia: | It's three thousand in total, and for every one thousand, they get three hundred. |
| Mendez: | OK |
| Mendez: | [CC-1] is over there/Is [CC-1] over there? |
| Herrera Garcia: | It's 900 for her and 2100 for me |
| Herrera Garcia: | Tell him/her that that they have to give me 2100 |
| Herrera Garcia: | OK |

(PSR ¶ 44).

Other text messages show that Mendez was involved in the business operations of the conspiracy. In particular, on December 16, 2022, a co-conspirator ("CC-1") left Mendez a voice note saying that if things continued to be like this he was probably going to "have to work on my

Case 1:23-cr-00504-JSR    Document 151    Filed 02/24/25    Page 9 of 17

Page 9

stuff again"—in other words, he was going to have to take business away from Mendez. (PSR ¶ 45). In response, Mendez forwarded the voice recording to Herrera Garcia and told him: "You're too tough with him, love." (PSR ¶ 45). Mendez then also reached out to Parra Paredes to see if Parra Paredes could "give some advice" to Herrera Garcia to correct the situation because, in Mendez's words, CC-1 was "super mad" and Herrera Garcia "shouldn't act that way towards [CC-1]" because "[CC-1 will] take our work away from us." (PSR ¶ 45). During the course of the exchange with Parra Paredes, Mendez expressed substantial concern about CC-1 taking CC-1's work away from the conspiracy, even stating that "sometimes [she] just want[ed] to take [Herrera Garcia] and slam him against the wall" for his behavior that would cost them business. (PSR ¶ 45).

In short, Mendez was deeply involved in the Daycare drug trafficking conspiracy—she established and ran the cover operation, she packaged the drugs, she dealt with sales and payment, and she attempted to rectify failing business relations to ensure that the conspiracy had a steady flow of work.

### E. Warning Signs Leading Up to the September 15, 2023 Poisonings

What happened at the Daycare on September 15, 2023, did not come without warning. Indeed, there were at least three events that occurred during the course of the conspiracy that alerted Mendez that storing and packaging narcotics in the Daycare would inevitably result in tragedy.

*First*, in October 2022, Herrera Garcia's brother died of acute fentanyl intoxication while packaging narcotics at an apartment in the Bronx. (PSR ¶ 30). Prior to that time, Mendez and her co-conspirators worked with Herrera Garcia's brother to traffic narcotics. (PSR ¶ 30). Crime scene photographs of the overdose scene show glassines consistent with the glassines found in the traps at the Daycare, along with narcotics packaging equipment including stamps, stamp pads, plastic bags, tape, and latex gloves. (PSR ¶ 30). Body camera footage from the officers responding to the scene shows Mendez, Herrera Garcia, and Parra Paredes all present. Instead of taking this overdose as a wake-up call, however, the conspiracy continued trafficking large quantities of fentanyl, transferring the remaining narcotics from Herrera Garcia's brother's apartment to what would become the Daycare space. (PSR ¶ 30).

*Second*, Mendez had first-hand knowledge of the danger of the drugs she was trafficking. While packaging narcotics in the Daycare, Mendez, Herrera Garcia, and Parra Paredes all became ill on multiple occasions. One such incident appears to have been captured in a series of voice notes exchanged between Mendez and Parra Paredes on January 18, 2023, in which Mendez discussed vomiting when coming upstairs after being in the Daycare space:

> Mendez: Nemo, leave the thing up there on the little table in . . in the living room, because . . . I forgot to take what you were going to give me because you know, I was sick when I went upstairs and I threw up right there next to the . . . the . . the steps, next to the first ones. I left that gift there for . . .[Laughs], to the super. I even felt embarrassed.

> Parra Paredes: That's fine, that's fine. You don't have to be embarrassed about it because he didn't see you. There was a bunch of trashy people here and he's not going to know who did it.
>
> Mendez: Yes, Nemo, that's what I said then. Do you know when . . do you know where we sometimes put the food after coming into the house, right there, by the door, in front of that stuff . . . in front of that stuff where he's got the plant? There's a mess of garbage on the other side, man, and when I was coming up there again, it's where . . . I finished it up right there. But at that point it was just a little bit, like some spit. But . . . the soup, everything. I barfed my guts out. But I'll come ready and prepared and will bring my thing tomorrow.

Despite repeated bouts of illness from exposure to the drugs, Mendez and her co-conspirators persisted in their activities, undeterred by the physical harm their narcotics caused to themselves or others. (PSR ¶ 47).

*Third*, in December 2022, approximately two months after the death of Herrera Garcia's brother, Mendez and Herrera Garcia's own child became sick after being in the Daycare space. (PSR ¶ 41). Mendez and Herrera Garcia were afraid to take the child—then a toddler—to the hospital because they feared he would test positive for drugs, though they ultimately did so. (PSR ¶ 41). The incident was captured in a series of voice messages exchanged between Mendez and co-defendant Amparo Herrera, in which Mendez described her child's fentanyl-induced illness:

> It looks like he ate something, and it made him sick, you know. It looks like he ate something down there and it made him sick, and he couldn't stop throwing up. Because we were down there for a while last night.

(PSR ¶ 37). "Down there" refers to the Daycare, which was located on the basement level of the building next door to the building in which Mendez, Herrera Garcia, and Parra Paredes resided together. There is also evidence that Mendez and Herrera Garcia limited their child's presence in the Daycare. For example, on September 9, 2022, Mendez wrote to the defendant: "Can I come down . . . down there with the baby." When the defendant responded that he had to "grind something," an activity consistent with their drug packaging, Mendez responded, "Ok." (PSR ¶ 46). In other words, Mendez and Herrera Garcia limited their own child's exposure to the Daycare, but they invited other people's babies in.

## II.     Procedural History and Guidelines Calculation

On October 29, 2024—six days before trial was scheduled to begin—Mendez pled guilty to all three counts of the S4 indictment, without a plea agreement. Those three counts of conviction are: (i) conspiracy to distribute and possess with intent to distribute narcotics resulting in death and serious bodily injury, in violation of 21 U.S.C. § 846; (ii) possession with intent to distribute narcotics resulting in death, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A); and (iii) possession with intent to distribute narcotics resulting in serious bodily injury, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A). Each count carries a mandatory minimum sentence of 20 years' imprisonment.

Probation calculates Mendez's Guidelines range as a base level 38, with enhancements for (i) maintaining a premises for the purpose of manufacturing or distributing controlled substances; (ii) the victim of the offense being a vulnerable victim; and (iii) being an organizer or leader. (PSR ¶¶ 78-89). After a two-point deduction for acceptance of responsibility, Probation calculates Mendez's offense level as 43, with a criminal history category of I. (PSR ¶¶ 89-97). Accordingly, Probation's calculated Guidelines range is life imprisonment. (PSR ¶ 157). The Government agrees with that calculation.

## III.     Discussion

### A. Applicable Law

As the Court is well-aware, the Sentencing Guidelines still provide guidance to sentencing courts following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). District courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

Following a court's calculation of the appropriate Guidelines range, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), when imposing a sentence. *Id.* & n.6. They are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Case 1:23-cr-00504-JSR   Document 151   Filed 02/24/25   Page 12 of 17

Page 12

18 U.S.C. § 3553(a)(2).

### B. A Sentence of Life Imprisonment Is Appropriate in this Case

A sentence of life imprisonment is appropriate in this case, as it was for Herrera Garcia. When Herrera Garcia was sentenced, the Government acknowledged, as it does here, that it was aware of the Court's views on the Sentencing Guidelines and life sentences,[7] but explained that after deep searching and close consideration it believed this to be a case in which consideration of the 3553(a) factors strongly called for the imposition of such a sentence. (*See* Dkt. 105.) The Government believes the same is true with respect to Mendez, who similarly has a Guidelines range of life imprisonment. Because the Government believes, for the reasons set forth in detail below, that Mendez is the individual most responsible for the harm that befell the babies on September 15, 2023, the Government respectfully requests that the Court impose a life sentence, but, at the very least, a sentence *at least* as long as the 45-year sentence imposed on Herrera Garcia.

### 1. The Section 3553(a) Factors

At this point, the Court is well-aware that the Section 3553(a) factors in this case—in particular, the nature and seriousness of the offense, the need to afford adequate deterrence, and the need to protect the public—weigh heavily in favor of a severe sentence. Accordingly, the Government will address those factors only briefly and instead focus on Mendez's relative culpability in the conspiracy.

With respect to the nature and seriousness of the offense, Mendez's crimes were extremely serious and resulted in profound and lasting harm to each of the involved families. MV-1 lost his life; his parents lost their son; and his siblings lost their brother. MV-2's family will forever be dealing with the health consequences of his near-death experience, and only time will tell whether there are any long-term impacts to MV-4 and MV-3 from receiving toxic doses of fentanyl at such a young age. (PSR ¶¶ 67-68). Yet the harm that occurred here was not as great as it could have been. Given the quantity of fentanyl that was in the Daycare, it is only a matter of chance that three other children were not killed by Mendez's conduct.[8] Moreover, the children at the Daycare are simply the most identifiable of Mendez's victims. The countless victims of the opioid crisis, injured and killed by fentanyl and its analogues, are a testament to the destructiveness of the conduct of Mendez and her co-conspirators.

In terms of the need to afford adequate deterrence, this case calls for both specific and general deterrence. With respect to specific deterrence, there is a strong need to specifically deter Mendez from ever participating again in the drug trade. Despite numerous drug-related incidents—including harm to their own health and the death of a family member—befalling Mendez and her co-conspirators, they *all* remained undeterred in their trafficking activities. In particular, after Herrera Garcia's brother died packaging fentanyl in October of 2022, Mendez in no way heeded that warning. Instead, the conspirators simply moved the location of the operation, into a space that in short order was concealed by a functioning daycare. Indeed, in a voice

---

[7] *See e.g.*, Transcript of 10/8/2024 Conference, 23 Cr. 504 (JSR), at 10.
[8] The parents of the children have requested that they be permitted to speak at sentencing.

exchange with CC-1 on December 16, 2022, Mendez appears to have lamented the loss of Herrera Garcia's brother because his death meant fewer customers:

> Mendez: . . . Because the thing is that [Herrera Garcia] doesn't have a mind like Ras [(Herrera Garcia's Brother)]. You know that Ras used to play games, but Ras had a lot more…many customers. It's not the same, you know. And that…[makes a sound with her mouth] it's tough, Menor. . . .[9]

Moreover, Mendez was similarly undeterred after she believed her own child was poisoned by the drugs in the Daycare. That event occurred in December 2022. Yet, six months later, with the Daycare space still loaded with drugs, Mendez was willing to take the risk of bringing *other people's babies* into that dangerous space. Not even Mendez's own illnesses while working and packaging drugs brought an end to her conduct. In short, there is every indication that Mendez's involvement in drug trafficking is behavior she has declined to change, even while knowingly risking her own life and the life of her young child.

   A lengthy sentence is also particularly important to deter others from engaging in similar conduct. Mendez and her co-conspirators decided that a daycare was an effective front for a drug den because law enforcement and anyone interested in stealing their valuable stash would be unlikely to look there. Such thinking cannot be permitted by <u>even one more</u> narcotics trafficker. Parents should not have to fear that when they leave their child at a daycare, or a school, or a camp, or with a babysitter, that their child is being used as a shield in the drug trafficking trade. The risk must outweigh the drug dealer's perceived reward. And even individuals who would just let narcotics traffickers use their daycares as a cover (which, to be clear, was not what happened here) must understand that they are highly culpable for the harm that follows.

   Finally, there is also a need to protect the public from additional drug trafficking conduct by Mendez. Although Mendez does not have prior criminal narcotics convictions, given Mendez's failure to change her ways even in the face of the multiple drug-related tragedies within her own family, there is grave concern that the callousness to human life Mendez has displayed, and her continued engagement in the drug industry, present a serious danger to the community.

   Accordingly, the Section 3553(a) factors weigh heavily in favor of a very substantial sentence in this case.

---

[9] "Ras" is the interpreter's phonetic spelling of the name heard on the recording. Herrera Garcia's brother went by "Rafi." This voice note exchange occurred approximately two months after Rafi's death. Based on the closeness of Rafi and "Ras," the fact that Mendez, Herrera Garcia and Parra Paredes worked with drugs with Rafi before his death, and the proximity in time between this note and Rafi's death, the phonetic "Ras" appears to be a shorthand for "Rafi."

### 2. Mendez's Relative Culpability

It is the Government's view that Mendez's relative culpability calls for a life sentence, or a sentence at least as great as the sentence imposed on Herrera Garcia. The Government believes this to be the case for the following reasons.

### a. Mendez was Deeply Involved in the Drug Trafficking Operation

First, although Mendez was not as thoroughly consumed by the day-to-day operation of the narcotics trafficking operation as her husband, she was still deeply, directly involved in the operation. Setting aside the fact that she established and ran the cover business—that is, the Daycare—Mendez herself packaged narcotics, dealt with the money, and involved herself in the business dealings of the organization.

As described in detail *supra* at seven, Mendez packaged narcotics for the conspiracy on a regular basis, stamping small glassines with a logo and then sealing and boxing the glassines (used for individual distribution) once they were filled with deadly narcotics. Text messages support the fact that she did this regularly and efficiently, with Herrera Garcia telling Mendez on one occasion: "Good heavens! You don't waste any time." (PSR ¶ 44.) On another occasion, CC-1 and Mendez had the following exchange, showing Mendez's involvement in preparing product for one of the trafficking organization's customers:

>    CC-1:    Let me know when that's ready so I can come pick it up.
>    Mendez:  But that's been ready
>    Mendez:  Since last night
>    Mendez:  It's ready.

(PSR ¶ 44.) Mendez also dealt with customers and money, as can be seen through text exchanges between Mendez and Herrera Garcia. (*See* PSR ¶ 44). Moreover, Mendez was in regular communication with customers like CC-1 about orders, deliveries, and payment. So although Herrera Garcia may have been doing the more labor-intensive and time-consuming drug packaging activities—he ground, mixed, and weighed the drugs instead of stamping and sealing glassines—Mendez's handling of the drugs and contributions with respect to orders and payments, and running the business that gave cover to their operation, were also important.

Similarly, although Herrera Garcia may have managed more of the business side of the conspiracy, Mendez also kept abreast of developments and tried to keep her husband on the right course to keep business flowing into the organization. Thus, when Mendez felt Herrera Garcia was taking too tough an approach with CC-1, she enlisted Parra Paredes to help her right the ship, asking him to talk some sense into Herrera Garcia. (PSR ¶ 45). Moreover, it is the tone of some of the messages Mendez exchanged with co-conspirators about the business that are the most revealing. For example, Mendez's statement to Parra Paredes that "sometimes [she] just want[ed] to take [Herrera Garcia] and slam him against the wall" for his behavior that would cost the organization business (PSR ¶ 45), and her statement to CC-1 lamenting how Herrera Garcia is not like "Ras[(his brother)]" because Ras "had a lot more . . . many customers," so "[i]t's not the same" and "it's tough." (PSR ¶ 45). Such statements show that Mendez was fully behind the family drug trafficking business, she wanted it to succeed, she wanted it to have more customers, and she

wanted the money that it generated, despite the fact that it had already killed one family member and was making her and other co-conspirators sick on a regular basis.

Thus, although Mendez is not as culpable as Herrera Garcia for the day-to-day drug handling and business strategy of the conspiracy, she still contributed to the daily narcotics packaging and distribution activities of the organization and very much supported its mission.

### b. Mendez, in Particular, Breached the Trust Placed in Her by the Babies' Parents

One of the most difficult things for a parent to do is to leave his or her child in the care of another—to trust another person with what that parent holds most dear in life. This case has taught the parents of MV-1, MV-2, MV-3, and MV-4, as well as parents across the City, that their children can be at risk even when they do everything right—even when they entrust their children to someone whose job is to hold them safe. Mendez, far more than Herrera Garcia, committed that gross breach of trust by establishing the Daycare and holding herself out to parents and the community center as a reliable and conscientious caretaker, when, in fact, she and her co-conspirators were using the babies under her care to conceal their large-scale drug operation.

Although Herrera Garcia rented the Daycare space, it was Mendez who established the Daycare. It was Mendez who became a licensed childcare provider. It was Mendez who filled-out the City's required paperwork and attended the City's required classes. It was Mendez who enlisted her co-conspirators to provide references saying that she is "very good with children" and would be "excellent" at providing a safe and loving environment. (PSR ¶ 32). It was Mendez who went to the community center and signed-up to be one of their providers so that the center's families—hardworking but vulnerable families in need of subsidized childcare—would be assigned to her daycare.[10] It was Mendez who was the sole caretaker of the babies in the Daycare. And it was Mendez who held herself out to the parents of the children as someone who would keep their children safe.

Mendez did all of those things knowing that there were kilos upon kilos of deadly fentanyl stored under the children's cribs and playmats; that at night Mendez and her co-conspirators packaged large quantities of lethal narcotics in the very space where the children played, slept and ate; and that the utensils Mendez used to make food each day for the babies were some of the same utensils used to strain, cook, and mix the poison peddled by the conspiracy. Mendez took these risks knowing exactly how dangerous her behavior was—Herrera Garcia's brother had already died packaging the same narcotics as those maintained in the Daycare, Mendez's own child had become sick and been taken to the hospital, and Mendez herself had been sickened by the product. In Mendez's own words the night of the tragedy, she's "not stupid," she "watch[es] the news" and "know[s] that stuff kills." (PSR ¶ 50).

In short, without Mendez, there would never have been a daycare. The children never would have become involved. There would have been just another drug trafficking ring moving large quantities of fentanyl and heroin out of a basement apartment—horrible and with life-

---

[10] The center did not give the families a choice in which daycare their children would attend. The families were assigned to Mendez's daycare for their fully subsidized childcare benefits.

threatening consequences unto itself, but without the conscience-shocking tragedy of the loss of infant life. It is Mendez who bears the responsibility of bringing babies into this drug ring.

### c. Mendez Has Added Culpability for Her Conduct on September 15, 2023

Finally, more than anyone else, Mendez should be held responsible for the degree of harm that occurred on September 15, 2023. Mendez was the person in whose care the children became sick and it was under her watch that the fentanyl found its way into their systems. More egregiously, though, Mendez should be held responsible for the fact that she did little to attempt to save the babies once it was clear that something had gone terribly wrong.

The earliest indication on September 13, 2023 that something was seriously amiss with the babies came at approximately 12:50 p.m., when MV-4 was picked-up early by his mother. Almost immediately after picking him up, MV-4's mother noticed that something was wrong—he was extremely sleepy and was having a hard time even holding his head up. He can be seen in this condition, resting on his mother's shoulder as she walks down the sidewalk in front of the Daycare after pick-up. (*See* Exhibit B).[11] The next indication we are aware of came approximately one hour later, at 1:43 p.m., when Mendez called Center Employee-1 to notify her that there was an issue with MV-1's breathing. (PSR ¶ 19). When Center Employee-1 asked Mendez to further describe the sound of MV-1's breathing, Mendez went to check on MV-1. Mendez then informed Center Employee-1 that everything was fine and that MV-1's mother was texting. MV-1's mother had texted Mendez several minutes earlier, but in that exchange Mendez made no mention at all of any issues with MV-1's breathing. (PSR ¶ 19). The next indication came one hour later at approximately 2:40 p.m., when Mendez called Center Employee-2, her husband, and then 911 to sound the alarm that two children under her care—MV-1 and MV-2—were nonresponsive.

Thus, for at least two hours before Mendez called 911, Mendez was aware of serious indications that there was something wrong with the children: MV-4 was strangely and concerningly sleepy and something was wrong with MV-1's breathing. Moreover, when help arrived, it did not seem that the children had just become ill in that instant—MV-1 and MV-2 were laying lifeless on the floor with little or no respiration and with blue lips.

The question, then, is what Mendez was doing in the Daycare during that two-hour period in which the children were becoming sick and dying. While that is unclear, what is clear is what she was *not* doing. Despite MV-4's strangely sleepy behavior, she was *not* observing the other children to see if something was also wrong with them. Similarly, despite MV-1's strange breathing sounds, she was *not* watching over him with care to make sure he was all right. This was not a large Daycare—it consisted of a small playroom, a kitchen, a bathroom, and a bedroom (which was not used by the Daycare), so keeping a close eye on the children would not have been a challenge. Moreover, given what Mendez knew about the dangerous drug activities she and her co-conspirators engaged in within the Daycare space and the kilos upon kilos of lethal fentanyl stored under the babies' cribs and playmats, Mendez should have been hyper-sensitive to any signs of illness displayed by the children.

---

[11] The Government also respectfully requests that Exhibit B be filed under seal.

Mendez's inaction continued even after she alerted authorities that the babies were non-responsive. It was MV-2 and MV-3's mother who cleared a path for emergency personnel, moving a stroller and opening the door, and it was MV-2 and MV-3's mother who attempted to seek aid from anyone in the vicinity. Nor did Mendez ever pull out the Narcan located in the Daycare bathroom and attempt to use it to revive the babies. Even after medical personnel arrived, Mendez did not tell them they should immediately try dosing the babies with Narcan or that the babies could have been exposed—as her own child had been—to potentially lethal narcotics. Instead, she left medical personnel to guess at what had happened to the babies (Were they exposed to gas? Was there carbon monoxide?)—when a treatment to address their condition could so quickly and easily have been applied.

Instead of helping the babies, what Mendez chose to do was try to save herself. She mentioned nothing about drugs to medical personnel, she feigned ignorance when police officers asked her about drugs in the Daycare, she attempted to destroy evidence of her involvement with the Daycare drug conspiracy, and at every step of the way on September 15, 2023, she put herself and her well-being ahead of the children. She prioritized her chance to "get away with it" ahead of the lives to those four helpless babies.

Mendez's conduct in opening the Daycare, in involving babies in the drug operation, and in holding herself out to the parents of the babies as someone they could trust is horrific. But her conduct on September 15, 2023, and the indifference she displayed toward the lives of those babies, is indefensible. She should be sentenced accordingly.

### IV.   Conclusion

For the reasons set forth above, the Government respectfully requests that the Court sentence the defendant to a term of imprisonment of life, or, at the very least, a sentence at least as long as the 45-year term of imprisonment imposed on her husband, Herrera Garcia. Such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By:   \_\_\_/s/_____
Maggie Lynaugh
Brandon Thompson
Assistant United States Attorneys

Karl P. Miller
Special Assistant United States Attorney

cc: Paul King, Esq. (by ECF & Email)